DROUILLARD v STROH BREWERY COMPANY

RISS v STROH BREWERY COMPANY

Docket Nos. 96422, 96423. Argued January 11, 1995 (Calendar No. 5).
Decided July 20, 1995.

Paul Drouillard was awarded worker's compensation for injuries
sustained during the course of his employment with the Stroh
Brewery Company. As a result of Stroh's decision to close its
brewery and to permanently lay off all employees, Stroh liqui-
dated its pension plan and paid Drouillard a lump sum. There-
after, a hearing referee granted an open award to continue
worker's compensation and held that medical and social secu-
rity benefits could be coordinated, but not the pension benefits.
The Worker's Compensation Appeal Board, reversed. The Court
of Appeals, TAYLOR, P.J., and BRENNAN and MARILYN KELLY,
JJ., affirmed, holding that coordination must continue to cover
the full after-tax amount of the pension being received (Docket
No. 134002). The plaintiff appeals.

Gerald Riss was awarded worker's compensation for injuries
sustained during the course of his employment with the Stroh
Brewery Company. A hearing referee allowed coordination of
sickness and accident benefits, unemployment benefits, and
lump-sum pension benefits. The Worker's Compensation Appeal
Board found that although pension funds were set aside for
retirement, because Riss did not retire, but was terminated
when Stroh closed the plant, the payments were severance
benefits involuntarily received, and not within the purview of
coordination of benefits. The Court of Appeals, TAYLOR, P.J.,
and BRENNAN and MARILYN KELLY, JJ., reversed, finding that
the lump-sum payment was subject to coordination (Docket No.
141039). The plaintiff appeals.

In an opinion by Chief Justice BRICKLEY, joined by Justices
LEVIN, BOYLE, RILEY, and WEAVER, the Supreme Court held:

MCL 418.354(1)(d); MSA 17.237(354)(1)(d) does not preclude
coordination where an employee is required to accept early
pension benefits.

1. Worker's compensation is one unit in a loosely connected
system of wage-loss protection that also includes unemployment
compensation, social security old-age, disability, and survivors

benefits, aid to families with dependent children, and general assistance, that is designed to restore to employees a portion of wages lost because of three major causes: physical disability, unemployment, and old age. The crucial operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. Because most social legislation in Michigan was implemented in unrelated fragments, failure to coordinate resulted in an accumulation of benefits. Before coordination, an employee could collect both unemployment and worker's compensation benefits at the same time. MCL 418.354; MSA 17.237(354) amended the worker's compensation act to provide for the coordination of wage-loss benefits to prevent duplicate wage-loss payments, while maintaining suitable wage-loss benefits.

2. Under MCL 418.354(1)(d); MSA 17.237(354)(1)(d), pension benefits ordinarily are subject to coordination. While, the statute itself provides exceptions, only a forced reading would permit the conclusion that in this case subsection 354(12) precludes coordination. Read in conjunction with the rest of the coordination statute, subsection 354(12) was intended only to void any inference that § 354 itself might permit or encourage employers to coerce early application for social security or pension benefits by withholding worker's compensation. It was not intended to apply to all cases in which an employee is required or compelled to accept early retirement benefits. Such an application would defeat the twin purposes of the coordination provision: elimination of duplicative wage-loss benefits while maintaining a suitable level of wage-loss payment.

Affirmed and remanded to the hearing referees for further proceedings.

Justice MALLETT, joined by Justice CAVANAGH, dissenting, stated that under the circumstances of these cases, subsection 354(12) of the Worker's Disability Compensation Act prohibits coordination of the plaintiffs' pension benefits with worker's compensation benefits. Subsection 354(12) explicitly bars compelling an employee to take an early pension payout.

Section 354 of the worker's compensation act allows an employer to reduce the amount of worker's compensation by coordination with other employment benefits paid by the employer. Pension benefits ordinarily are subject to coordination. However, subsection 354(12) was specifically designed to protect an employee's interest in future wage-loss benefits and to prohibit an employer from coordinating worker's compensation benefits where an employee is compelled to accept an early pension payout.

In this case, the plaintiffs either were not informed that

leaving the money in trust was an option or operated under the assumption that monies left in trust would not accumulate interest. While the plaintiffs were not forced to take lump-sum payments and were given the option of leaving their accumulated monies in the pension fund, such a choice would have been irrational because any money not received would not have accumulated interest. For purposes of the statute, the plaintiffs were compelled to accept an early payout of pension benefits, which subsection 354(12) expressly prohibits.

199 Mich App 67; 501 NW2d 229 (1993) affirmed.

*Miller, Cohen, Martens, Ice & Geary, P.C.* (by *Murray A. Gorchow*), for the plaintiffs.

*Cummings, McClorey, Davis & Acho, P.C.* (by *Daniel J. O'Leary*), for the defendants.

BRICKLEY, C.J. At issue in this appeal is the coordination of worker's compensation and early pension benefits pursuant to MCL 418.354; MSA 17.237(354). In particular, plaintiffs contend that they were compelled to accept early payment of their retirement benefits and are therefore exempt from coordination of these benefits under MCL 418.354(1)(d); MSA 17.237(354)(1)(d). We hold that plaintiffs' interpretation of this statutory provision is erroneous and that MCL 418.354(1)(d); MSA 17.237(354)(1)(d) does not preclude coordination where an employee is required to accept early pension benefits. We therefore affirm the disposition of these cases by the Court of Appeals and remand them to the hearing referees for further proceedings consistent with this opinion.

I

On February 8, 1985, Stroh Brewery Company announced its plan to close its brewery and to permanently lay off all brewery employees effective December 31, 1985. As a result of the plant

closing, Stroh liquidated its employee pension plan
and paid its employees pension benefits. Plaintiff
Riss, age fifty-three at the time, received
$64,505.13 in a lump sum. Plaintiff Drouillard,
then age fifty-four, received $52,748.03 in a lump
sum.

At the time the liquidation plan was announced,
the contract plan administrator for the pension
fund conducted meetings to explain the effect of
the liquidation. Different classes of employees were
invited to the meetings (salaried, hourly, able and
disabled employees), and defendant prepared pen-
sion distribution applications for all employees.
Riss attended one of these meetings; Drouillard did
not attend the meetings and instead received his
pension distribution information by mail.

At these assemblies the contract plan adminis-
trator gave all employees several forms, including
a benefit election form. This form provided the
employees with two choices regarding their pen-
sion benefits. First, employees could have their
pension monies held in a trust, which would then
be transferred to an insurance annuity until the
employee requested distribution. Second, employ-
ees could take receipt of their pension benefits
either in the form of a single lump-sum payment
or rolled over into an individual retirement ac-
count. It is significant to plaintiffs' argument that
they were told that it would be in their best
interests to reject the trust option.

Defendant's contract plan administrator testified
that he instructed Stroh's employees that if they
left their pension monies in the trust it would
earn no interest and therefore it was not wise to
leave the money in the trust. It is disputed
whether the plan administrator told the employees
that they had the option of leaving the money in
the trust. However, he did advise that persons

with questions about the effect of payouts on their worker's compensation benefits should seek legal counsel.

Paul Drouillard began working for Stroh's as a general laborer on June 4, 1956. At some point during the late 1960's or early 1970's, Drouillard injured his back while at work. He occasionally aggravated this injury, and he sometimes missed work as a result. On February 19, 1985, Drouillard slipped and fell on oil and allegedly sustained injuries to his neck, right shoulder, back, and musculoskeletal system. Drouillard never returned to work after this accident.

Drouillard received worker's compensation benefits from defendant from February 20, 1985 until June 26, 1985. He filed a petition for continuing worker's compensation on July 2, 1985. On November 20, 1985, Drouillard received the lump-sum pension payment of $52,748.03 from the trust fund. In March, 1986, the magistrate found that Drouillard had sustained an aggravation of his preexisting degenerative arthritic condition and granted an open award of worker's compensation benefits. The magistrate held that Stroh could coordinate Drouillard's medical and social security benefits, but held that Stroh provided insufficient proof to allow coordination of pension benefits. The Worker's Compensation Appeal Board submitted an order reversing the magistrate in this regard, stating that the worker's compensation payments were subject to coordination in accordance with §§ 354(1)(d) and 354(13).

Gerald Riss began work for the Stroh Brewery Company on April 2, 1956. During his employment he sustained injuries to his back, right shoulder, and wrist. Riss injured his back in 1957, 1965, and 1975. In 1965, his injuries required surgery, and he missed six months of work, returning to

restricted light-duty work. In 1973, Riss injured his shoulder, which also required surgery; however, he did not miss work at that time. In 1973, and again in 1982, Riss sustained injuries to his wrist. From 1982 to 1985, this injury became progressively worse. However, he continued to work through May 28, 1985. He had surgery on his wrist two days later and was unable to return to work before Stroh closed the plant on May 31, 1985. Riss received benefits from May 31, 1985, through July 30, 1985. After recuperating from the wrist surgery, Riss was capable of returning to restricted work, but did not do so.

In May, 1988, Riss was granted an open award of worker's compensation by the hearing referee. The hearing referee allowed Stroh to "coordinate sickness and accident benefits, unemployment benefits, and pension benefits received by plaintiff, in accordance with the [worker's compensation] act." The WCAB opined that the funds were set aside for retirement and because Riss did not retire, but instead was terminated, and because Stroh had shut down the plant, the payments were not for retirement. Instead, the board classified the benefits as "severance benefit[s] involuntarily received," which are not within the purview of the coordination language of § 354. 1991 WCABO 761, 771.

The Court of Appeals consolidated these cases and affirmed the WCAB determination in *Drouillard* and reversed the WCAB determination in *Riss*. See *Drouillard v Stroh Brewery Co,* 199 Mich App 67; 501 NW2d 229 (1993). Citing *Barr v Stroh Brewery Co,* 189 Mich App 549; 473 NW2d 716 (1991), the Court determined that the lump-sum payouts were subject to the coordination language of the worker's compensation act. *Drouillard, supra* at 71.

II

Worker's compensation is one unit in a loosely connected system of wage-loss protection that also includes unemployment compensation, social security old-age, disability, and survivors benefits, aid to families with dependent children, and general assistance. *Franks v White Pine Copper Div,* 422 Mich 636, 654; 375 NW2d 715 (1985). Such wage-loss legislation is designed to restore to employees a portion of wages lost because of three major causes of wage loss: physical disability, unemployment, and old age. The crucial operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. See, generally, 4 Larson, Workmen's Compensation, § 97, p 18-9 (1995 Supp, p 106).

Because most social legislation in Michigan was implemented in unrelated fragments, failure to coordinate resulted in an accumulation of benefits. For example, before coordination, it was not unusual for an employee to collect both unemployment and worker's compensation benefits at the same time. However, if an employee undergoes a period of wage loss, it does not follow that he should receive multiple wage-loss benefits simultaneously. An employee can experience only one wage loss and, in any logical or coherent system, should receive only one wage-loss benefit at any one time. *Id.*

As part of the 1981 amendments of the worker's compensation act, the Legislature added § 354, which provides for the coordination of wage-loss benefits. The purpose of this legislation was to prevent duplicate wage-loss payments while main-

taining suitable wage-loss benefits.[1] The coordination of worker's compensation and early pension benefits pursuant to § 354 presents a complicated set of issues previously only considered by the Court of Appeals.[2]

---

[1] The legislative history of MCL 418.354; MSA 17.237(354) provides:

Coordination of benefits has been a major concern of employers for years. Public Act 357 coordinated workers' compensation with unemployment compensation (effective January 1, 1982) but failed to address coordination with Social Security and other insurance and pension plans. By coordinating workers' compensation benefits with Social Security and other benefits, Senate Bill 595 would provide a major savings to employers in the cost of workers' compensation while maintaining adequate benefit levels for disabled workers.

From its creation in 1912, workers' compensation in Michigan has been intended as a means of protecting an employee's ability to earn wages by replacing wages lost because of a disability resulting from an on-the-job injury. Since 1912, other public and private wage replacement insurance programs have appeared with the result that many employees now receive wage-loss benefits from two, three, or four different programs providing a total wage "replacement" greater than the wages the employee earned while on the job, while employers who must contribute to these programs find themselves paying more than once to replace the wages of a single employee. Such a situation is contrary to the basic philosophy of Michigan's wage-loss system and discourages some disabled employees from returning to work. Coordination of benefits, as proposed in Senate Bill 595, would reduce the overlap between the various public and private wage replacement programs while ensuring adequate wage-loss benefits to injured employees. [Senate Legislative Analysis, SB 595, adopted as 1981 PA 203, Coordination of Benefits, Supporting Arguments (January 7, 1982).]

[2] *Barr v Stroh Brewery* is the only published Michigan opinion that addresses a fact pattern similar to that presented in this case. In *Barr*, the plaintiff was receiving worker's compensation when Stroh divested itself of the plaintiff's employing unit and terminated its pension plan for those employees. The plaintiff was informed of his options, which included immediately receiving a pension of slightly more than $600 per month or having an amount of money equal to his share in the pension plan rolled over into an IRA. The plaintiff selected the second option and received a draft for over $56,000, rolling over $30,000 into an IRA and keeping the balance. The Court of Appeals held that all of the monies paid to an employee from a pension fund when an employer closes its business are subject to coordination.

III

Plaintiffs concede that under MCL 418.354(1)(d); MSA 17.237(354)(1)(d), pension benefits ordinarily are subject to coordination.[3] However, the statute itself provides exceptions. For example, subsection 354(1)(e) allows the employer to reduce the proportional amount of the pension where the employee has also contributed to the pension. Additionally, subsection 354(14) prohibits an employer from co-

The application of the coordination statute in the context of pension benefits is confused by prior, conflicting Court of Appeals actions. In *Knox v Stroh Brewery Co,* unpublished order of the Court of Appeals, issued August 18, 1992 (Docket No. 129690), the plaintiff received a lump-sum check from the liquidated pension fund that he then rolled over into an IRA. The magistrate in that case disallowed coordination, ruling that a lump-sum payout that was rolled over into an IRA is not subject to coordination until the plaintiff receives the payout as taxable income. The WCAC affirmed and the Court of Appeals denied the defendants' delayed application for leave to appeal. Conversely, in *Lemke v Stroh Brewery Co,* unpublished order of the Court of Appeals, issued July 23, 1992 (Docket No. 130194), the Court of Appeals peremptorily reversed a WCAC decision refusing to coordinate a lump-sum payment that was immediately rolled over into an IRA, and then remanded *Lemke* to the WCAC for further proceedings consistent with *Barr.*

[3] The relevant subsections of MCL 418.354(1); MSA 17.237(354)(1) provide:

This section is applicable when either weekly or lump sum payments are made to an employee as a result of liability pursuant to section 351, 361, or 835 with respect to the same time period for which . . . pension or retirement payments pursuant to a plan or program established or maintained by the employer, are also received or being received by the employee. Except as otherwise provided in this section, the employer's obligation to pay or cause to be paid weekly benefits other than specific loss benefits under section 361(2) and (3) shall be reduced by these amounts:

* * *

(d) The after-tax amount of the pension or retirement payments received or being received pursuant to a plan or program established or maintained by the same employer from whom benefits under section 351, 361, or 835 are received, if the employee did not contribute directly to the pension or retirement plan or program.

ordinating a disability pension plan that was in existence on March 31, 1982.

Plaintiffs contend that they are exempted from coordination by MCL 418.354(12); MSA 17.237(354)(12). In reference to this provision, plaintiffs contend that subsection 354(12) precludes coordination in all cases in which an employer "compels" employees to accept early retirement or pension benefits. We first note that it is not clear that plaintiffs were compelled to accept early retirement benefits. It is apparent that plaintiffs were told that the more expedient course would be to accept their pension benefits. However, it is also true that this was general advice to a disparate audience and plaintiffs were specifically instructed to seek legal advice if they had questions. However, even accepting arguendo plaintiffs' contention that they were compelled to accept early pension benefits, we believe that the conclusion that subsection 354(12) thereby precludes coordination only follows from a forced reading of the statute.

The cardinal rule of statutory construction is to discern and give effect to the intent of the Legislature. *Murphy v Michigan Bell Telephone Co,* 447 Mich 93, 98; 523 NW2d 310 (1994). It has long been an accepted principle of statutory construction, in discerning the legislative will through its enactments, to construe a statute so as to give full effect to all its provisions. See, e.g., *Malonny v Mahar,* 1 Mich 26 (1847). Subsection 354(12) provides:

> *Nothing in this section* shall be considered to compel an employee *to apply* for early federal social security old-age insurance benefits or *to apply* for early or reduced pension or retirement benefits. [Emphasis added.]

As indicated by the emphasized language, we be-

lieve a clue to the proper interpretation of subsection 354(12) can be found in the language "Nothing in this section" and "to apply." A plain and straightforward interpretation of this provision shows that the Legislature was addressing something less than is claimed by the plaintiffs. This statute clearly and unambiguously provides that Michigan's coordination statute *itself* should not be interpreted to compel application for early pension benefits.

This interpretation is supported by reading subsection 354(12) in conjunction with the rest of the coordination statute. In fact, this Court is so required; in the interpretation of statutes, effect must be given, if possible, to every word, sentence and section and, to that end, the entire act must be read to be an harmonious and consistent enactment as a whole. *Dussia v Monroe Co Employees Retirement System,* 386 Mich 244, 248; 191 NW2d 307 (1971). Subsection 354(3) provides that employers shall be notified of an employee's eligibility for social security benefits and that employees shall apply for social security benefits when eligible.[4]

---

[4] MCL 418.354(3); MSA 17.237(354)(3) provides:

In the application of subsection (1) any credit or reduction shall occur pursuant to this section and all of the following:

(a) The bureau shall promulgate rules to provide for notification by an employer or carrier to an employee of possible eligibility for social security benefits and the requirements for establishing proof of application for those benefits. Notification shall be promptly mailed to the employee after the date on which by reason of age the employee may be entitled to social security benefits. A copy of the notification of possible eligibility shall be filed with the bureau by the employer or carrier.

(b) Within 30 days after receipt of the notification of possible employee eligibility the employee shall:

(i) Make application for social security benefits.

(ii) Provide the employer or carrier with proof of that application.

(iii) Provide the employer or carrier with an authority for release of information which shall be utilized by the employer

Subsection 354(4) provides that an employer can withhold worker's compensation benefits until an employee timely applies for social security benefits.[5] In light of these two provisions, subsection 354(12), and particularly its "Nothing in this section" language, manifestly means that an employer cannot withhold worker's compensation benefits in order to "compel" an employee to apply early for social security or pension benefits.[6]

The Legislature could have, but did not, easily written the statute to read clearly and unambiguously as the plaintiffs would like: "Coordination of benefits will not apply if the employer compels the employee to receive early or reduced pension, retirement or other benefits that can be coordinated." We believe that subsection 354(12) was intended only to void any inference that § 354

or carrier to obtain necessary benefit entitlement and amount information from the social security administration. The authority for release of information shall be effective for 1 year.

[5] MCL 418.354(4); MSA 17.237(354)(4) provides:

Failure of the employee to provide the proof of application or the authority for release of information as prescribed in subsection (3) shall allow the employer or carrier with the approval of the bureau to discontinue the compensation benefits payable to the employee under section 351, 361, or 835 until the proof of application and the authority for release of information is provided. Compensation benefits withheld shall be reimbursed to the employee upon the providing of the required proof of application, or the authority for release of information, or both.

[6] We recognize that while subsection 354(12) refers to both social security and pension benefits, subsections 354(3) and (4) refer only to social security benefits. We note that on submission, the House of Representatives amended subsection 354(12) and added the language "or to apply for early or reduced pension or retirement benefits." 1981 Senate Journal 2575. The original bill contained reference only to federal social security old-age insurance benefits. We interpret this amendment to subsection 354(12) to require that pension benefits be treated as the statute clearly intends social security benefits be treated. Any other interpretation of this statute would lead to incongruous and unreasonable results.

itself might permit or encourage employers to coerce early application for social security or pension benefits by withholding worker's compensation. It was not written to apply to all cases in which an employee is required or "compelled" to accept early retirement benefits. To have written the statute in such a manner would defeat the twin purposes of the coordination statute, i.e., the elimination of duplicative wage-loss benefits while maintaining a suitable level of wage-loss payment.

IV

Contrary to the argument of the plaintiffs, MCL 418.354(1)(d); MSA 17.237(354)(1)(d) was intended only to void any inference that Michigan's worker's compensation coordination statute might permit or encourage employers to coerce early application for social security or pension benefits by withholding worker's compensation. We therefore affirm the disposition of these cases by the Court of Appeals and remand them to the hearing referees for further proceedings consistent with this opinion.

LEVIN, BOYLE, RILEY, and WEAVER, JJ., concurred with BRICKLEY, C.J.

MALLETT, J. (*dissenting*). In these consolidated cases[1] we address whether defendant is allowed to

[1] This is the second time that this case has reached this Court. See 444 Mich 901 (1993). We remanded and entered the following order:

In lieu of granting leave to appeal, the case is remanded to the workers' compensation magistrate for the prompt (no later than 90 days from the date of this order) development of a record, preferably based on a stipulation by the parties, on the general subject whether the affected Stroh employees were permitted to leave their pension money in the pension plan despite the plant closing. MCR 7.302(F)(1). The amplified record

coordinate plaintiffs' employee pension benefits with their worker's compensation benefits pursuant to the Worker's Disability Compensation Act, MCL 418.354; MSA 17.237(354).[2] Because we disagree with the majority, we would hold that under the circumstances presented in these cases, the exception contained in § 354(12) prohibits defendant from coordinating plaintiffs' benefits.[3] Regard-

---

should include, for example, whether each affected employee was effectively required to choose among various options (e.g., cash distribution, IRA rollover, annuity) to which the pension account balance, in a pension trust that was being liquidated, would be forwarded. The magistrate is directed to issue a finding describing how, if at all, affected Stroh employees with workers' compensation claims were permitted to leave their pension money in the Stroh pension plan without adversely affecting their right to claim workers' compensation benefits. Jurisdiction is retained. Reported below: 199 Mich App 67 [501 NW2d 229 (1993)].

[2] The relevant sections of MCL 418.354(1); MSA 17.237(354)(1) provide:

(1) This section is applicable when either weekly or lump sum payments are made to an employee as a result of liability pursuant to section 351, 361, or 835 with respect to the same time period for which . . . pension or retirement payments pursuant to a plan or program established or maintained by the employer, are also received or being received by the employee. *Except as otherwise provided in this section,* the employer's obligation to pay or cause to be paid weekly benefits other than specific loss benefits under section 361(2) and (3) shall be reduced by these amounts:

\* \* \*

(d) The after-tax amount of the pension or retirement payments received or being received pursuant to a plan or program established or maintained by the same employer from whom benefits under section 351, 361, or 835 are received, if the employee did not contribute directly to the pension or retirement plan or program. [Emphasis added.]

[3] Section 354(12) provides one of the exceptions referred to in § 354(1).

Nothing in this section shall be considered to compel an employee to apply for early federal social security old-age

ing § 354(12), the Court of Appeals briefly stated:

> Arguments that [§ 354(12)] of the coordination statute operates to prevent the coordination of these pension benefits cannot be sustained without doing violence to *Barr's* [*v Stroh Brewery Co,* 189 Mich App 549; 473 NW2d 716 (1991)] holding that these benefits are subject to coordination. [199 Mich App 67, 71; 501 NW2d 229 (1993).]

We disagree with this holding, not because we believe that an employer may not reduce the full amount of the pension received under the coordination statute, but rather, because § 354(12) explicitly bars compelling an employee to take an early pension payout. Accordingly, we would reverse the decision of the Court of Appeals.

I

Worker's compensation, like other wage replacement programs, is a social welfare program.[4] Generally, under the worker's compensation statute of

insurance benefits or to apply for early or reduced pension or retirement benefits.

[4] Describing the protective purpose of the worker's compensation scheme, this Court stated in *Franks v White Pine Copper Div,* 422 Mich 636, 654; 375 NW2d 715 (1985):

> Workers' compensation benefits are social-welfare income-maintenance benefits. Workers' compensation is the first or progenitor safety net providing a means of income maintenance for persons who have met misfortune or whose regular income source has been cut off. All the social welfare programs—workers' compensation, unemployment compensation, social security old age, disability, and survivors benefits, no-fault automobile benefits, aid to families with dependent children, and general assistance—are directed to the same objective, income maintenance. All these programs are funded by impositions on employers and others of mandatory payments (to the government, insurers or, in the case of the self-insured, to the beneficiary), with statutorily prescribed benefits.

this state, an employer must pay benefits while an
employee is disabled. See MCL 418.301 *et seq.*;
MSA 17.237(301) *et seq.* Before January 1, 1982,
the payment of worker's compensation benefits
had no effect on other employee benefits. However,
in December, 1981, the Legislature enacted § 354,
which allows an employer to coordinate worker's
compensation benefits with other benefits. Essen-
tially, § 354 allows an employer to reduce the
amount of worker's compensation benefits relative
to other employment benefits paid by the em-
ployer.

Under MCL 418.354(1)(d); MSA 17.237(354)(1)(d),
pension benefits ordinarily are subject to coordina-
tion. However, the statute itself provides excep-
tions. For example, § 354(1)(e) allows the employer
to reduce the proportional amount of the pension
where the employee has also contributed to the
pension. Additionally, § 354(14) prohibits an em-
ployer from coordinating a disability pension plan
that was in existence on March 31, 1982.

In the present case, we are concerned with the
exception found in MCL 418.354(12); MSA
17.237(354)(12), which provides:

> Nothing in this section shall be considered to
> *compel* an employee to apply for early federal
> social security old-age insurance benefits or to
> apply for early or reduced pension or retirement
> benefits. [Emphasis added.]

In reference to this provision, plaintiffs contend
that they were *compelled* by the circumstances to
accept an early pension benefits payout.

Conversely, defendant claims that plaintiffs had
the option not to apply for their benefits. Defen-
dant maintains that any participants not paid
because of a failure to apply would have had their

benefits turned over to a third party, i.e., an insurance company.

To resolve this dispute, we must determine how § 354(12) fits into the overall statutory scheme and if the Legislature intended this section to apply in this type of case.

II

It is well settled in Michigan that when construing statutes, the cardinal rule is to discern and give effect to the Legislature's intent. *Murphy v Michigan Bell Telephone Co,* 447 Mich 93, 98; 523 NW2d 310 (1994); *Pioneer State Mut Ins Co v Allstate Ins Co,* 417 Mich 590, 595; 339 NW2d 470 (1983). This is accomplished by interpreting statutory language according to its commonly accepted meaning. *Production Credit Ass'n of Lansing v Treasury Dep't,* 404 Mich 301; 273 NW2d 10 (1978), rev'g 68 Mich App 409; 242 NW2d 794 (1976), and aff'g *Michigan Consolidated Gas Co v Treasury Dep't,* 72 Mich App 426; 250 NW2d 85 (1976). Where a statute is plain and unambiguous in its terms, the courts have nothing to do but to obey it. *Mull v Equitable Life Ins Co,* 444 Mich 508, 514, n 7; 510 NW2d 184 (1994); *Gardner-White Co v State Bd of Tax Administration,* 296 Mich 225, 230; 295 NW 624 (1941). When different statutes address the same subject, courts must endeavor to read them harmoniously and give them reasonable effect. *House Speaker v State Administrative Bd,* 441 Mich 547, 568; 495 NW2d 539 (1993). Further, it has long been recognized that the Worker's Disability Compensation Act is remedial in nature and should be construed in a liberal and humanitarian manner in favor of the employee. *Bower v Whitehall Leather Co,* 412 Mich 172, 191; 312 NW2d 640 (1981).

III

The coordination-of-benefits provisions were designed in part to prevent an employee from receiving duplicate benefits. Defendant contends that if it is not allowed to coordinate benefits, plaintiffs would, in essence, receive more than they are entitled to under the worker's compensation scheme. The history of § 354 demonstrates a desire on the part of the Legislature to protect worker's compensation benefits while remedying a recurring dual-benefits payment quandary that had existed since the enactment of the worker's compensation statute.

> Coordination of benefits has been a major concern of employers for years. Public Act 357 coordinated workers' compensation with unemployment compensation (effective January 1, 1982) but failed to address coordination with Social Security and other insurance and pension plans. By coordinating workers' compensation benefits with Social Security and other benefits, Senate Bill 595 would provide a major savings to employers in the cost of workers' compensation *while maintaining adequate benefit levels for disabled workers.*
> From its creation in 1912, workers' compensation in Michigan has been intended as a means of protecting an employee's ability to earn wages by replacing wages lost because of a disability resulting from an on-the-job injury. Since 1912, other public and private wage replacement insurance programs have appeared with the result that many employees now receive wage-loss benefits from two, three, or four different programs providing a total wage "replacement" *greater than the wages the employee earned while on the job,* while employers who must contribute to these programs find themselves paying more than once to replace the wages of a single employee. Such a situation is contrary to the basic philosophy of Michigan's

wage-loss system and discourages some disabled employees from returning to work. Coordination of benefits, as proposed in Senate Bill 595, would reduce the overlap between the various public and private wage replacement programs *while ensuring adequate wage-loss benefits to injured employees.* [Senate Legislative Analysis, SB 595, adopted as 1981 PA 203, Coordination of Benefits, Supporting Arguments (January 7, 1982). Emphasis added.]

Therefore, there was a dual purpose to the enactment of the coordination statute. First, the legislation was crafted to provide employers major savings in worker's compensation costs. Second, the emphasized excerpts show the specific intent to protect adequate wage-loss benefits to injured employees. Thus, coordination of benefits must not be allowed at the expense of the worker's compensation act as a whole.

Defendant argues that § 354(12) is an intrinsic statutory construction aid rather than a limitation on an employer's right to coordinate benefits. We disagree. The language of the statute itself gives no indication that § 354(12) was designed to be a proviso that only clarifies the remainder of the statute. Instead, the contrary is true. A proviso is generally added as a clause that limits the operation of the rule and removes special cases from the general enactment. Such clauses generally are set apart from the general enactment and are to be strictly construed. 1A Singer, Sutherland Statutory Construction (5th ed), § 20.22, p 110. Thus, for § 354(12) to be considered a proviso, it would have had to been drafted to address special cases only.

Moreover, it is clear from the history of SB 595 that the Legislature intended to protect the interest employees have in their pension benefits. On submission, the House of Representatives amended

§ 354(12) and added the language "or to apply for
early or reduced pension or retirement benefits."
1981 Senate Journal 2575. The original bill con-
tained reference only to federal social security old-
age insurance benefits.

Federal social security old-age insurance and
pension plans are aimed at meeting the income
needs of individuals post retirement. Conversely,
worker's compensation benefits are designed to
provide replacement wages during an employee's
disability status. Clearly, the Legislature recog-
nized the different wage replacement purposes of
these social welfare programs and intended to
separate current wage-loss benefits from future
wage-loss benefits. This fundamental difference in
purpose lends further support to the notion that
the benefits, in these circumstances, should not be
coordinated. Thus, it is clear that the Legislature
was specifically concerned with protecting pension
benefits.

A reading of the statute as a whole indicates
that § 354(12) was meant to apply to all cases in
which an employer compels employees to accept
early retirement or pension benefits. Section
354(12) was specifically designed to protect an
employee's interest in future wage-loss benefits
and to prohibit an employer from coordinating
worker's compensation benefits where an employee
is compelled to accept an early pension payout. We
believe this was the intent of the legislation and
accordingly would apply § 354(12) to this case.

IV

There have been several cases concerning § 354
and the coordination of worker's compensation
benefits, but relatively few have considered coordi-
nating worker's compensation benefits with pen-

sion benefits.[5] *Barr v Stroh Brewery,* however, is a case that arose under comparable circumstances.

In *Barr,* the plaintiff was injured and was receiving worker's compensation benefits. During the plaintiff's disability, Stroh Brewery divested itself of the plaintiff's employment unit and terminated its pension plan with those employees. As a result, the plaintiff was given the option to receive an immediate monthly pension or to have an amount of money equal to his share in the pension plan rolled over into an individual retirement account. The plaintiff received a draft for $56,642, rolled over $30,000 into an IRA, and retained the balance. The Court of Appeals allowed Stroh to coordinate worker's compensation benefits with the retained balance without addressing the application of § 354(12).[6] *Id.* at 551.

The present case is different from *Barr* in two respects. First, the event giving rise to the liquidation was different in each case. Because of this, the plaintiff in *Barr* was not a party to the liquidation that is central to the dispute in this case. Second, and perhaps more importantly, the present facts indicate that plaintiffs were compelled to accept the payout, leaving them without a rational choice. There is no indication in *Barr* that the

[5] The following administrative decisions have properly upheld the right to coordinate worker's compensation and pension benefits under the appropriate circumstances. In *Vyn v Rapistan Div of Lear Siegler,* 1994 WCACO 320, the appellate commission held that lump-sum payouts of pension or retirement funds are subject to coordination under subsection (1)(d).

In *Lemke v Stroh Brewery,* 1993 WCACO 1106, the commission held that the purpose of coordination is so that employers should not be required to pay twice for employees' nonworking status, so lump-sum distribution must be coordinated over a sufficient period of time. See also *Blevins v Shinville Associates,* 1993 WCACO 1443.

[6] The Court also held that the liquidation of this pension plan and the payment thereon does not make the payment of those benefits severance pay, and that, thus, the payments fall, within the parameters of the ERISA. See *Barr v Stroh Brewery, supra; Shea v Wells Fargo Armored Service Corp,* 810 F2d 372 (CA 2, 1987).

plaintiff alleged he was compelled to take an early pension payout.

Moreover, in *Barr,* the plaintiff was given the opportunity to begin receiving a monthly pension. Riss' and Drouillard's choices consisted of receiving the pension benefits in a lump sum or electing not to take such a distribution. Stroh's pension fund administrator testified about two dispositive facts that effectually left plaintiffs without a meaningful choice: first, that if they did not accept the payout, their money would not accrue interest. Second, if an employee chose not to receive such a payout, the money would be transferred to an insurance company.

Maine is the only other state that has statutory language similar to that at issue in the present case. The Me Rev Stat Ann, tit 39-A, § 221(8), provides:

> Nothing in this section may be considered to compel an employee to apply for early federal social security old-age insurance benefits or to apply for early or reduced pension or retirement benefits.

In *Jordan v Sears Roebuck & Co,* 651 A2d 358 (Me, 1994), the Supreme Court of Maine was asked to interpret the legislative intent of its coordination of benefits statute. The plaintiff suffered a compensable back injury and, because of his inability to work, was forced into early retirement. Sears gave the plaintiff approximately $22,000 in funds that Sears had paid into the plaintiff's pension account, and that the plaintiff immediately rolled it over into an IRA. Subsequently, Sears filed a petition to coordinate benefits. The court held that an employer is not entitled to a coordination of compensation benefits when an

employee rolls pension benefits over into an IRA until those funds are distributed from the IRA.

We do note, however, that the *Jordan* court held that the statutory language found at § 221(8) provides protection against the mandatory coordination of benefits where the employee is forced into early retirement. *Id.* at 361, n 3. We also recognize that the Michigan provision, § 354(12), was designed to protect a worker's earned pension benefits that are designed for retirement and are not intended to replace current wages.

V

The presentation of the employees' options in the liquidation meetings not only distinguishes this case from *Barr,* but it also should be determinative of the outcome. At the meetings, each employee was presented with the following forms that were prepared in advance by the contract plan administrator: (1) an application for benefits, (2) a benefit election form, (3) an election for payees of lump-sum distributions, and (4) a waiver form. The benefit election form provided the employees with two options. First, the employee could elect a joint and survivor annuity. Second, an employee could revoke any joint and survivor annuity and take the distribution in a single payment or it could be rolled into an individual retirement account.

The administrator explained that the law required that a married employee elect a joint and survivor annuity, unless spousal consent for another option was obtained. Significantly, none of the forms indicated that the employees could leave their money in the trust.

It was suggested to the employees that it would be in their best interests to accept lump sums

instead of leaving their money in trust. At the remand hearing, defendant's contract plan administrator, Dean Holefca, testified:

> What I was trying to differentiate is that if you left the money in the trust it would accumulate dust. *It would not earn any interest.* And, therefore, it was not wise to leave the money in the trust. Therefore, they really didn't have, in that respect, in that regard, or it *would be foolish to leave the money in the trust.* That was the point I was trying to make. [Emphasis added.]

With respect to the consequences of leaving the money in the fund, Mr. Holefca testified:

> *Q.* Tell us what would happen to their vested pension benefit if they did not apply for it?
>
> *A.* If they did not apply for their benefit, and because it is the intention of Stroh Brewery Company to terminate the Plan, then any participant's benefits who are not paid because of failure to apply for the benefit, those benefits would have been given to a third part[y]; i.e., an insurance company and the obligation to pay the benefits would pass from the Stroh Retirement Plan to the insurance company.

In fact, no provisions were made by the plan to establish and maintain a trust in which employees could leave their benefits. Moreover, it is unknown whether the insurance company was to establish some sort of trust under which the employees' money would remain in trust and accumulate interest.

There also appears to be some dispute concerning whether the plan administrator even told the employees that they had the option of leaving the money in trust. For example, Holefca testified:

*Q.* Did you tell any of these people, the Stroh's terminated employees, when you had the meetings that you had with them, or in your letters to them, did you tell them they could just leave the money in the plan and they did not have to elect any of the options you mentioned?

*A.* I did at the meetings; that's correct. But, I also told them, at these meetings, that if they left the money in the plan it would accrue no interest.

\* \* \*

*Q.* You have testified in a number of these Stroh's cases for Workers' Compensation; correct?

*A.* That's correct.

*Q.* The last time you did you also agree that you remember testifying in the case of *Gilbert Shane v Stroh Brewery Company;* is that correct?

*A.* That's correct.

\* \* \*

*Q.* That was within a year after these events occurred with the Stroh's shutdown, and the meetings that you had; correct?

*A.* That's correct.

\* \* \*

*Q.* Do you recall saying at that time; being asked the question, "Did you tell any of these people, when you had these meetings, or in your letter to these people, *did you tell them they could just leave their money there and they didn't have to elect one of these options*?" Answer, *"No, I did not."* Did I read that correctly?

*A.* You read that correctly. [Emphasis added.]

From this dialogue, we conclude that plaintiffs either were not informed that leaving the money in trust was an option or operated under the assumption that monies left in trust would not accumulate interest. Indeed, it is these facts that necessitate the determination that Stroh Brewery is not entitled to coordinate plaintiffs' benefits under § 354.

As the WCAB stated:

> Also, MCL 418.354(12) [MSA 17.237(354)(12)]
> states in terms that the employer may not compel
> the employee to apply for early retirement bene-
> fits, and if defendant did not do so in this case,
> what did it do? If plaintiff had any other choice
> than to draw out his pension benefits at once or
> take them over time, that choice does not appear
> here. His job ended and he was out of work. We
> agree completely with plaintiff's briefed argument
> that coordination of benefits, designed, as every-
> body connected with the Act well knows, to pro-
> hibit "double dipping" and unjust enrichment by
> employees, could not be applied when an employee
> was forced into early "retirement," when a plant
> closed ending his employment. Obviously, that is
> what Section 354(12) is telling us in plain words,
> though defendant does not mention it either. [1991
> WCABO 761, 771.]

In this regard, we agree with the WCAB. Section
354(12) "*is* telling us in plain words" that the act
"could not be applied when an employee was
forced into early 'retirement.'" *Id.* (emphasis
added). However, while Stroh itself may not have
been directly responsible for compelling plaintiffs
to accept the lump-sum payment,[7] plaintiffs were
nevertheless compelled within the meaning of the
statute. A clear reading of the statute indicates
that § 354(12) is to be viewed from the perspective
of the employee.

Simply stated, the focus of the inquiry is
whether plaintiffs were compelled to accept an
early pension payout, not whether defendant was

---

[7] It is important to note that the liquidation was caused by the
shutdown of the plant. Defendant Stroh is a separate entity from the
plan and Dean Holefca has no relation to defendant. However, the
plaintiffs were nevertheless compelled to accept early pension payout.
Because worker's compensation is a social welfare program, we need
not find fault on the part of the defendant.

actually the compelling party. Indeed, like other social welfare programs, worker's compensation is a no-fault system.

> In 1912, Michigan along with most of the other states, adopted a worker's compensation act. The new remedy was essentially a no-fault system, under which a worker no longer had to prove negligence on the part of the employer and the employer's three defenses were eliminated. The intent of the law was to require an employer to compensate a worker for any injury suffered in the course of the worker's employment, *regardless of the existence of any fault.* [Welch, Worker's Compensation in Michigan: Law & Practice (2d ed), p 2.]

Thus, the relationship of Dean Holefca to the defendant is irrelevant,[8] except that defendant is nevertheless obligated to pay worker's compensation to the plaintiffs as long as they remain disabled. A literal reading of the coordination statute prohibits the compulsion of an early pension payout. See *Franks v White Pine Copper Div,* 422 Mich 636, 658; 375 NW2d 715 (1985).

The question before us then is whether the employer is allowed to coordinate benefits pursuant to § 354(1)(d) or whether the closing of the brewery and the subsequent liquidation of the pension plan *compelled* the employees to accept an early pension payout that would provide the exception outlined in § 354(12).

The *Random House Webster's College Dictionary* at 276, defines "compel" as follows: "to force or

[8] Dean Holefca is the owner and president of a company that administrates trust funds. He emphasized in his testimony on remand that he is the contract plan administrator and not the plan administrator. Under the ERISA, plan administrators have discretionary powers over pension funds and are therefore fiduciaries of the funds. 29 USC 1104. Mr. Holefca testified that, as a contract plan administrator, he may only carry out the directives of the board.

drive, esp. to a course of action . . . . Compel implies an external force; *it may be a persuasive urging from another person or a constraining reason or circumstance* . . . ." (Emphasis added.) We would apply this definition to the occurrences in the present case. While plaintiffs were not forced to take the lump-sum payment and were given the option of leaving their accumulated monies in the pension fund, such a choice would have been irrational because any money not received would not have accumulated interest. Indeed, the contract plan administrator either did not inform the employees of this option or made it seem such a poor choice that any rational person would have begrudgingly accepted an immediate lump-sum payout. The word compel, as used in the statute, is not so inflexible as to suggest that the company would have had to force the employees to accept only one undesirable option. Instead, under the limited circumstances presented here, we would construe compel to mean the absence of a rational choice. Thus, for the purposes of the statute, plaintiffs were compelled to accept an early payout of pension benefits, which § 354(12) expressly prohibits.

## VI

An employer may liquidate a pension plan, and lump-sum payments are subject to the provisions of the coordination statute if the liquidation is properly administered. However, in our opinion, the plaintiffs in this case had no meaningful choice other than to accept these lump-sum payouts. The option of leaving their money in trust was represented as a poor choice. Moreover, the employees were led to believe that the value of their pensions would not be left intact. In essence, the employees

were told that their money would not earn interest. This fact represents a very real compulsion for employees to apply for a distribution. Because plaintiffs were compelled to accept lump-sum payouts, defendant should not be able to coordinate plaintiffs' worker's compensation benefits with their pension benefits. Accordingly, we would reverse both cases.

CAVANAGH, J., concurred with MALLETT, J.