RANGEL v RALSTON PURINA COMPANY
COPE v RALSTON PURINA COMPANY
HADDIX v RALSTON PURINA COMPANY
GREENMAN v RALSTON PURINA COMPANY

Docket Nos. 227266, 227267, 227268, 227269. Submitted August 7, 2001, at Lansing. Decided November 2, 2001, at 9:15 A.M. Leave to appeal sought.

Rosita Rangel, Mattie Cope, Dolores Haddix, and Carolyn Greenman were awarded worker's compensation benefits payable by Ralston Purina Company by a worker's compensation magistrate who rejected the defendant employer's contention that any worker's compensation obligation owed to each plaintiff employee could be reduced by the amount received by the plaintiff under a voluntary severance agreement. The defendant had argued that the payments received under the severance agreement were part of a wage continuation plan for purposes of MCL 418.354, which provides for a reduction of worker's compensation liability for payments made under an employer-provided wage continuation plan. Pursuant to the severance agreement, each plaintiff had agreed to separate from the payroll and relinquish all recall and future employment rights with the defendant in exchange for a lump-sum payment based not on the plaintiff's weekly hourly wage, but on the weekly plant average straight time hourly wage multiplied by the plaintiff's years of employment. Under the severance agreement, the defendant had agreed to provide worker's compensation benefits "according to law." The Worker's Compensation Appellate Commission (WCAC), sitting en banc, affirmed the magistrate's decision in each of the plaintiffs' cases. The defendant appealed by leave granted in each case, and the appeals were consolidated.

The Court of Appeals *held*:

1. MCL 418.354 provides that an employer's obligation to pay worker's compensation benefits will be reduced when the employee is receiving payments under a self-insurance plan, a wage continuation plan, or a disability insurance policy provided by the employer, or when the employee is receiving pension or retirement payments pursuant to a plan or program established or maintained by the employer. The intent of the Legislature in promulgating

§ 354 was to prohibit an employee's double recovery for one wage loss. In the present cases, each plaintiff does not receive double recovery for one wage loss in receiving worker's compensation benefits and a lump-sum payment under the severance agreement. Therefore, the amounts the defendant paid to the plaintiffs pursuant to the severance agreement should not be credited against the defendant's worker's compensation liability, if any, pursuant to § 354. The lump-sum payments to the plaintiffs under the severance agreement were not a continuation of their wages inasmuch as the payments were not based on each plaintiff's weekly hourly wage or on some projected period in which each plaintiff might find a new position. Also, the plaintiffs received the lump-sum payments in consideration of giving up their rights to employment with the defendant.

2. In the cases involving Rangel, Cope, and Haddix, the WCAC correctly affirmed the magistrate's decision to award worker's compensation benefits. Rangel, Cope, and Haddix each suffered a wage loss resulting from a disability before entering into the severance agreement. The link between each plaintiff's disability and her wage loss was not supplanted or cut off by her acceptance of the severance agreement.

3. In the case involving Greenman, the WCAC erred in affirming the magistrate's decision to award worker's compensation benefits. Greenman is not entitled to worker's compensation because her wage loss was not causally linked to her work-related injury. Greenman quit working not because she could not physically perform her job duties, but because she voluntarily agreed to separate from the payroll and relinquish all recall and future employment rights with the defendant in exchange for the lump-sum payment under the severance agreement.

Affirmed with regard to Docket Nos. 227266, 227267, and 227268; reversed with regard to Docket No. 227269.

WHITE, J., concurring in part and dissenting in part, stated that the WCAC correctly determined that the severance payments did not constitute a wage continuation plan pursuant to § 354 and that the plaintiffs are entitled to worker's compensation. The WCAC's determination that Greenman sustained wage loss from a work-related disability, not from her agreement to sever her employment, should also be affirmed because although Greenman continued to work, she did so with a work-related injury that disabled her from performing all the requirements of her job. Greenman also suffered aggravations to her work-related injury until her last day of work.

WORKER'S COMPENSATION — COORDINATION OF BENEFITS — SEVERANCE
AGREEMENTS.

Worker's compensation benefits for a disabling work-related injury
sustained before an employee enters into a severance agreement
under which the employee voluntarily separates from the payroll
and relinquishes all recall and future employment rights with the
employer in exchange for a lump-sum payment by the employer are
not to be coordinated with the severance lump-sum payment; such
a severance agreement is not an employer-provided wage continua-
tion plan as contemplated by § 354 of the worker's compensation
act, which provides for coordination of worker's compensation
benefits and employer-provided wage continuation plan benefits
(MCL 418.354).

*Geil, Smit & Kragt, P.C.* (by *Stuart M. Saunders*
and *Thomas D. Geil*), for Rosita Rangel and Dolores
Haddix.

*McCroskey, Feldman, Cochrane & Brock, P.C.* (by
*James T. Haadsma*), for Mattie Cope.

*Chambers, Steiner & Sturm, P.L.C.* (by *Karen L.
Anderson*) for Carolyn Greenman.

*Ryan, Jamieson, Morris & Ryan* (by *Christopher
D. Morris*) and *Miller, Johnson, Snell & Cummiskey,
P.L.C.* (by *Leonard M. Hickey* and *Lori J. Stich*), for
Ralston Purina Company.

Before: K. F. KELLY, P.J., and WHITE and TALBOT, JJ.

TALBOT, J. In these consolidated cases, defendant
Ralston Purina Company appeals by leave granted
from orders of the Worker's Compensation Appellate
Commission (WCAC), sitting en banc, affirming the
decisions of the magistrate to award benefits to plain-
tiffs. These cases share one common issue of first
impression, to wit, whether the amounts defendant
paid to plaintiffs pursuant to a severance agreement
should be credited against defendant's worker's com-

pensation liability obligation, if any, pursuant to § 354 of the Worker's Disability Compensation Act (WDCA), MCL 418.354, as part of a "wage continuation plan."

We hold that the amounts should not be credited against defendant's worker's compensation obligation. We affirm the WCAC's decisions in Docket Nos. 227266, 227267, and 227268, and reverse its decision in Docket No. 227269.

I

Defendant manufactures breakfast cereal. Each of the four employees in these cases, Rosita Rangel, Mattie Cope, Delores Haddix, and Carolyn Greenman, worked for defendant in various capacities at its Battle Creek operation. In 1996, defendant sought to downsize the company and reduce the size of its workforce and entered into a bargaining process with the union representing its employees.

The agreement resulting from the bargaining process provided that those individuals volunteering to take part in a severance agreement would receive a lump sum of money. The lump sum would not be based on an individual's weekly hourly wage, but on the weekly "plant average straight time hourly wage of $19.27 per hour" multiplied by the individual's number of years of employment, with a maximum individual lump-sum payment of $25,000. Participants would also receive a payment of either $1,000 or $2,000 for the cost of financial planning, job retraining, relocation, or career counseling, although the participants could use the money however they saw fit. In exchange for the lump-sum payment, participants expressly agreed to "separate from the payroll" and

"relinquish all recall and future employment rights with the Company." The severance agreement did not contain the phrase "wage continuation." The severance agreement stated that "[t]he Company agrees to provide Worker's Compensation benefits according to law."

The agreement was offered to employees in July 1996 and February 1997, with various time frames for acceptance based on seniority. Individuals who did not accept the severance agreement would be permanently laid off in March 1997. Each of the four plaintiffs in these cases signed the severance agreement, and, in each of the four cases, defendant subsequently asserted that the amounts it paid to plaintiffs pursuant to the severance agreement should be credited against its worker's compensation liability obligation pursuant to § 354. We briefly state the facts of the cases at bar, keeping in mind that we are directed by constitutional and statutory provisions to treat the WCAC's findings of fact as conclusive, in the absence of fraud. *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 701; 614 NW2d 607 (2000).

DOCKET NO. 227266

Rangel claimed to have suffered a work-related injury and stopped working for defendant in June 1995, although she returned to work for defendant for one day in June 1996. She signed the severance agreement in August 1996 and applied for worker's compensation benefits in December 1996. The magistrate held that Rangel had suffered a work-related disability and that benefits should be awarded accordingly.

On appeal, a majority of the WCAC agreed, holding that "[o]n this record, the link between plaintiff's ongoing disability and her wage loss was not supplanted or cut off by her acceptance of the severance agreement." The WCAC found that the average weekly wage chosen was not plaintiff's average weekly wage based on her years of seniority and that the "plan did not in any way compensate her for her disability." The WCAC observed that defendant, "faced with a need to downsize its unionized plant, took away workers' jobs at a cost." The WCAC concluded that it was "abundantly clear" that the agreement was not a wage continuation plan within the meaning of § 354 and that defendant's argument for coordination of the benefits should therefore be rejected.

DOCKET NO. 227267

Cope claimed to have suffered a work-related injury to her back in December 1994. She continued to work until October 1995, when she suffered another alleged work-related injury to her shoulder. She eventually had surgery on her shoulder in June 1996. She was returned to light work in December 1996, but no work was available. In January 1997, she applied for worker's compensation benefits. She signed the severance agreement in March 1997.

The magistrate found that Cope's acceptance of the severance buyout did not preclude her receipt of worker's compensation benefits, again rejecting defendant's argument that severance pay is subject to coordination under § 354. On appeal, the majority of the WCAC affirmed, expressly adopting its reasoning in *Rangel*.

DOCKET NO. 227268

Haddix was receiving worker's compensation bene-
fits when she signed the severance agreement in July
or August 1996. She subsequently filed a petition
alleging that defendant had improperly begun to coor-
dinate her benefits after she severed her employment.

The magistrate found that Haddix' acceptance of
the severance buyout did not permit defendant to
coordinate her worker's compensation benefits. The
WCAC again adopted its reasoning in *Rangel* and
denied defendant's request for coordination.

DOCKET NO. 227269

Greenman claimed to have suffered a work-related
injury to her back in November 1992. She worked one
more month, until December 1992, and had surgery
on a herniated lumbar disc in February 1993. In May
or June 1993, she returned to work, performing in
various positions while under lifting restrictions. She
worked until March 1997, when she signed the sever-
ance agreement. She applied for worker's compensa-
tion benefits in June 1997.

The magistrate held that Greenman's entrance into
the severance agreement with defendant did not
affect an award of benefits to her. As in *Rangel, Cope,*
and *Haddix,* the magistrate concluded that severance
pay is not subject to coordination under § 354 and
rejected defendant's arguments that the payments
were coordinative because they constituted a wage
continuation plan.

Regarding a specific date of disability, the magis-
trate opined the following:

It is somewhat speculative to assign a date of disability as of plaintiff's last day of work because the most proximate cause of plaintiff's lack of wages was due to a layoff. However, I believe that plaintiff was disabled at this time because she was only able to completely perform her work by relying upon her husband or other workers for help. I believe plaintiff's testimony that she was treating with Dr. Tehrani for her complaints. It is apparent that plaintiff sought treatment from Dr. Koymen on March 19, 1997 (on a referral from Dr. Tehrani) and aggressively pursued treatment thereafter with Dr. Russo. It is clear that Dr. Russo disabled plaintiff from the type of work that she was performing. Therefore, I find that plaintiff has demonstrated a loss of wages attributable to her work-related disability. This is especially so when seen in the context of her ability to compete with able bodied workers in work suitable to her qualifications and training now that she is not working for defendant. Even in plaintiff's MESC documents, she has indicated that she would only be able to work in light factory-type jobs because of her back problems.

Defendant appealed to the WCAC, and the WCAC affirmed the magistrate's award. The WCAC rejected defendant's argument that plaintiff's agreement to sever her employment, not her disability, was responsible for her subsequent unemployment and wage loss:

Since the magistrate's findings concerning the plaintiff's work at defendant after her injury are supported by the record, we must reject defendant's request to terminate plaintiff's worker's compensation benefits as of the plant downsizing. The magistrate determined that plaintiff returned to work after her injury and continued to aggravate her work-related injury through her last date worked. She awarded benefits based on a last-day-worked injury date. Regardless of whether plaintiff's post-injury employment was reasonable, because it exceeded her restrictions and she deteriorated, plaintiff became disabled from this

work. Therefore, the link between injury and wage loss is
supported on this record.

Further, the WCAC held that because plaintiff was
disabled from the postinjury work, the question of a
new wage-earning capacity was irrelevant. The WCAC
held that it also "cannot be said that she was avoiding
work" where plaintiff "did not voluntarily quit her
job" but had her job "taken from her."

For the reasoning expressed in *Rangel*, the WCAC
held that plaintiff's benefits were not subject to coor-
dination with her severance payment.

II

As stated above, these cases share one common
issue, to wit, whether the amounts defendant paid to
plaintiffs pursuant to a severance agreement should
be credited against defendant's worker's compensa-
tion liability obligations, if any, pursuant to § 354 of
the WDCA as part of a "wage continuation plan."

This issue concerns the proper interpretation and
application of § 354. The interpretation of statutes is
a question of law, which this Court reviews de novo,
according great weight to the administrative interpre-
tation of the statute unless that interpretation is
clearly wrong. *Mudel, supra* at 697, n 3; *Hoste v
Shanty Creek Management, Inc,* 459 Mich 561, 569;
592 NW2d 360 (1999). We agree with the majority of
the WCAC that the amounts should not be credited
against defendant's worker's compensation obligation.

In general, if an employee undergoes a period of
wage loss, it does not follow that the employee
should receive multiple wage-loss benefits simultane-
ously; rather, because an employee can experience

only one wage loss, the employee should receive only one wage-loss benefit at any one time. *Drouillard v Stroh Brewery Co*, 449 Mich 293, 299; 536 NW2d 530 (1995). Hence, the Legislature promulgated MCL 418.354 to coordinate benefits received by an employee from an employer. *Id.* According to one commentator, the coordination of benefits scheme is basically that "[a]n employer's worker's compensation liability is reduced for virtually any other benefits the worker receives to the extent that the employer paid for the benefits." Welch, Worker's Compensation in Michigan: Law & Practice, § 18.14.

Section 354 provides that an employer's obligation to pay worker's compensation benefits will be reduced either (1) when the employee is receiving payments under a self-insurance plan, *a wage continuation plan*, or a disability insurance policy provided by the employer or (2) when pension or retirement payments pursuant to a plan or program established or maintained by the employer are also received or being received by the employee. MCL 418.354. Here, defendant argues that its worker's compensation liability in these four cases should be reduced because the employees received payments under a wage continuation plan. We disagree.

The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998). Here, the intent of the Legislature in promulgating § 354 was to prohibit an employee's double recovery for one wage loss. *Drouillard, supra.* In receiving both worker's compensation benefits and the lump-sum payment from the severance agreement, plain-

tiffs in this case are not realizing a double recovery for one wage loss. For at least two reasons, the lump-sum payment does not constitute compensation for their wage loss.

First, the lump-sum payment is simply not a "continuation" of the employees' wages. Defendant argues that the payments made pursuant to the severance agreement are "wage continuation benefits" under § 354 because they were paid to offset wage loss and were based on a "wage" of the plant's average hourly payment. Similarly, defendant argues that it is not necessary to designate a specific period to which a lump-sum payment is meant to apply if the lump-sum payment in fact represents payment for weeks worked. However, we find it significant that the payments made under the severance agreement were not based on an individual's weekly hourly wage or on some projected period in which an individual might find a new position.

Second, although we may agree with defendant that whether the payment is deemed "wage continuation," "employee buyout," or "severance" is a semantic issue, we find it significant that the express language of the agreements nonetheless provided that plaintiffs received the lump-sum payment in consideration of giving up certain employment rights. Specifically, participants agreed to "separate from the payroll" and "relinquish all recall and future employment rights with the Company." Thus, it is possible to properly receive worker's compensation benefits to compensate for a loss of wages resulting from a disability while simultaneously receiving a lump-sum payment from a severance agreement to compensate for the loss of employment rights.

Therefore, we hold that the WCAC did not err in its
construction of the phrase "wage continuation plan"
in MCL 418.354. The payments defendant made to
plaintiffs pursuant to the severance agreement could
not be credited against its worker's compensation lia-
bility obligation to plaintiffs. We turn next to a discus-
sion of defendant's worker's compensation liability.

III

As in any worker's compensation case, the mere
availability of uncoordinated worker's compensation
benefits does not compel the conclusion that a claim-
ant is entitled to benefits. Plaintiffs were still required
to show that they were entitled to worker's compen-
sation benefits.

There are two relevant inquiries in determining if
an employee is entitled to worker's compensation
benefits: first, whether an employee has proved that a
disability exists and, second, if the employee proves
that a disability exists, whether the employee has
proved that the disability resulted in a wage loss (i.e.,
whether the wage loss is "causally linked" to the
work-related injury). *Haske v Transport Leasing, Inc,*
455 Mich 628, 642, 664-665; 566 NW2d 896 (1997).
Here, only the second inquiry is at issue.

A

In Docket Nos. 227266, 227267, and 227268, we
agree with the WCAC's decision to affirm the magis-
trate's award of benefits to plaintiffs Rangel, Cope,
and Haddix. In all three of these cases, the link
between each plaintiff's ongoing disability and her
wage loss was not supplanted or cut off by her

acceptance of the severance agreement. Rather, Rangel, Cope, and Haddix each suffered a wage loss resulting from her disability before entering into the severance agreement. Therefore, we affirm the WCAC's decisions in Docket Nos. 227266, 227267, and 227268.

B

In contrast, in Docket No. 227269, we hold that Greenman is not entitled to worker's compensation benefits and therefore reverse the WCAC's decision in that case. In so holding, we do not accept defendant's argument that payments to Greenman are coordinative because they constitute a wage continuation plan; rather, we conclude that Greenman is not entitled to worker's compensation benefits because her wage loss was not causally linked to her work-related injury.

In this regard, defendant argues that the critical question is *why* Greenman is no longer working. Defendant opines that Greenman's unemployment was caused by economic factors (i.e., the layoff), not by Greenman's physical condition or any change in restrictions by her doctor. Defendant concludes that Greenman's disability is therefore not compensable with worker's compensation benefits because Greenman's current unemployment resulted from her personal, voluntary choice to sign the severance agreement and remove herself from the workforce.

The WCAC, however, held that because plaintiff became disabled from her postinjury employment, this disability resulted in a wage loss. The WCAC found that plaintiff was disabled from her postinjury employment because she was only able to perform

her work duties with the aid of her husband and other colleagues at work.

This Court is required to accept the WCAC's findings of fact as conclusive absent fraud. See *Mudel, supra.* However, even accepting the WCAC's finding that Greenman was able to perform her work duties only with the aid of her husband and other colleagues at work, we posit that this finding reveals merely that Greenman had a *potential* for wage loss in the event that she quit working because she could not perform the duties on her own.

We find it significant that Greenman never quit working because of her disability, i.e., she never quit working because she could not perform the duties on her own. Consequently, there was no wage loss caused by Greenman's disability that would entitle her to worker's compensation benefits. To the extent that Greenman has in fact lost wages since March 1997, that wage loss is attributable to her agreement to "separate from the payroll" and "relinquish all recall and future employment rights with the Company," a bargain for which she received consideration through her acceptance of the lump-sum severance pay.[1]

Affirmed with regard to Docket Nos. 227266, 227267, and 227268; reversed with regard to Docket No. 227269.

K. F. KELLY, P.J., concurred.

---

[1] Because we hold that Greenman is not entitled to worker's compensation benefits, we have not addressed the additional argument defendant presented in Docket No. 227269 that Greenman established a new wage-earning capacity in her postinjury work.

White, J. (*concurring in part and dissenting in part*). I agree that the severance agreement payments did not constitute a "wage continuation plan" and join the majority in Docket Nos. 227266, 227267, and 227268. I respectfully dissent from the majority's reversal of the WCAC's decision in Docket No. 227269.

The WCAC rejected defendant's argument that Greenman's agreement to sever her employment, not her disability, was the cause of her subsequent unemployment and wage loss:

> Since the magistrate's findings concerning the plaintiff's work at defendant after her injury are supported by the record [she was able to fully perform her work only by relying on her husband and other workers], we must reject defendant's request to terminate plaintiff's worker's compensation benefits as of the plant downsizing. The magistrate determined that plaintiff returned to work after her injury and continued to aggravate her work-related injury through her last date worked. She awarded benefits based on a last-day-worked injury date. Regardless of whether plaintiff's post-injury employment was reasonable, because it exceeded her restrictions and she deteriorated, plaintiff became disabled from this work. Therefore, the link between injury and wage loss is supported on this record.

The WCAC also stated that it cannot be said that Greenman was avoiding work where she did not voluntarily quit, but had her job taken from her. The record established that Greenman would be laid off regardless of whether she accepted the severance agreement.

The magistrate and the WCAC thus found that although Greenman continued to work, she did so with a work-related injury that disabled her from performing all the requirements of her job. Further, she suffered aggravations to her work-related injury until

her last day of work. Finally, she stopped working because she was laid off, not because she accepted the severance agreement. At that time, she was disabled from her work and would suffer an injury-related wage loss. Giving the WCAC the deference to which it is entitled, *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000), I find no error and would affirm.