CORBETT v PLYMOUTH TOWNSHIP

DANE v STROH BREWERY COMPANY

WHITE v McLOUTH STEEL PRODUCTS

Docket Nos. 97085, 97599, 102521. Argued October 8, 1996 (Calendar Nos. 2-4). Decided December 27, 1996. Rehearings denied in *Dane* and *White*, 454 Mich 1211.

Shawn Corbett was awarded worker's compensation for a work-related emotional disability incurred in the course of his employment as a police officer with Plymouth Charter Township. Thereafter, he elected to receive a lump-sum pension distribution. A magistrate ruled that Plymouth Township could coordinate the employer-funded portion of the distribution over fifty-two weeks by reducing his worker's compensation to allow for after-tax benefits. The Worker's Compensation Appeal Board affirmed. The Court of Appeals, SAWYER, P.J., and MACKENZIE and McDONALD, JJ., denied leave to appeal in an unpublished order (Docket No. 157978). The plaintiff appeals.

Dennis J. Dane sought worker's compensation for work-related injuries incurred in the course of his employment with the Stroh Brewery Company. Thereafter, the plant was closed permanently, and the plaintiff received a lump-sum distribution of his interest in the Stroh retirement fund. A magistrate awarded worker's compensation, and ruled that the pension distribution should be coordinated with the worker's compensation benefits on the basis of the amount the plaintiff would have received if he had used the pension monies to purchase an annuity. The Worker's Compensation Appeal Board affirmed. The Court of Appeals, McDONALD, P.J., and MACKENZIE and SAWYER, JJ., denied leave to appeal in an unpublished order (Docket No. 142619). The plaintiff appeals.

Willis B. White sought worker's compensation for a work-related mental disability incurred in the course of his employment with McLouth Steel Products. Thereafter, he received a lump-sum pension distribution from McLouth Steel Products, which he deposited into an IRA. He also began receiving pension payments from Pension Guarantee Corporation, which was obligated to make payments for McLouth Steel Corporation, the predecessor of McLouth Steel Products. A magistrate subsequently awarded him worker's

compensation, but denied coordination with the pension benefits from both employers. The Worker's Compensation Appellate Commission affirmed the award of benefits, but ordered coordination with the lump-sum distribution. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and SAWYER and GRIFFIN, JJ., vacated the decision in an unpublished order and remanded the case for reconsideration of the finding of disability (Docket No. 156856).

On remand, the commission denied all benefits. After remand, the Court of Appeals, D. E. HOLBROOK, JR., P.J., and MACKENZIE and GRIFFIN, JJ., vacated the decision of the WCAC in an unpublished order and remanded for reconsideration in light of *Gardner v Van Buren Public Schools*, 445 Mich 23 (1994) (Docket No. 173750). On second remand, the WCAC granted an open award of benefits, denied coordination with the pension benefits, but did not address coordination with the lump-sum distribution. The Court of Appeals, MACKENZIE, P.J., and MCDONALD and MURPHY, JJ., affirmed in part and reversed in part in an unpublished order, holding that there was evidence supporting the decision regarding White's mental disability, that the defendants were not entitled to coordination with pension benefits from McLouth Steel Corporation, and that payments from McLouth Steel Products pension plan, including the lump-sum distribution, should be coordinated (Docket No. 181516). The parties appeal.

In an opinion by Justice LEVIN, joined by Justices CAVANAGH, BOYLE and MALLETT, the Supreme Court *held*:

In *Corbett* and *Dane*, when a lump sum is withdrawn early from a pension or retirement program, the weekly worker's compensation payment is to be reduced by an amount that will amortize, in equal weekly payments, the proportion of the after-tax amount of the lump sum contributed by the employer over the employee's life expectancy. In *White*, when a lump sum is withdrawn early from a pension or retirement program and rolled over into an IRA, the employer is not entitled to an offset or reduction in the weekly worker's compensation payment before the earlier of withdrawal from the IRA or the time when payments from the pension or retirement program would have been made had there not been early withdrawal. Further, in *White*, McLouth Steel Products is not entitled to a reduction in the weekly worker's compensation payment in respect to amounts paid by the Pension Benefit Guarantee Corporation on behalf of the pension obligation to the plaintiff of the predecessor corporation, McLouth Steel Corporation. The Worker's Compensation Appellate Commission did not err in affirming the magistrate's finding of mental disability.

1. MCL 418.354; MSA 17.237(354) provides that where the weekly worker's compensation payment involves the same period for which payments from a pension or retirement program are made, the weekly compensation payments shall be reduced by a proportional amount, on the basis of the ratio of the employer's contributions of the total contributions to the program, of the after-tax amount of the pension or retirement payments being received by the employee pursuant to the program. Fifty percent of old-age and disability insurance payments under the Social Security Act and the proportion of pension, retirement, and profit sharing and other payments funded by the employer are to be coordinated with and reduce the weekly worker's compensation payment due from the employer.

2. These cases do not concern coordination of weekly worker's compensation payments with weekly, monthly, or other periodic payments from a pension or retirement program. Rather, they concern the coordination with a lump sum paid at the employee's election for early withdrawal from the program before normal retirement. While the opening clauses of subsection 354(1) expressly refer to weekly or lump-sum payments of worker's compensation benefits, there is no express reference to lump-sum payments of pension or retirement benefits. Although subsection 354(12) provides that an employee is not obliged to apply for early or reduced retirement benefits, the Legislature did not expressly provide for the manner of coordinating lump-sum payments on early withdrawal from a pension or retirement program. Worker's compensation benefits are social welfare-wage replacement benefits for workers whose injuries arise out of and in the course of employment and are normally paid weekly on the basis of the injured worker's average weekly wage for the duration of the disability. Retirement benefits are normally distributed monthly, calculated and distributed in accordance with the retirement program and the retiree's life expectancy, and generally provide fixed regular payments for life. Thus, where a lump sum is received on early withdrawal, weekly compensation payments should be reduced by an amount that will amortize, in equal weekly payments, the amount to be offset over the employee's life expectancy. The reduction in the weekly compensation payment was not intended to be limited to only the week in which the lump sum is actually received, nor was the weekly compensation payment to be eliminated entirely until the aggregate of the weekly payments equals the lump sum withdrawn.

3. Nothing in § 354 compels an employee to apply for early or reduced pension or retirement benefits. The concept of future

credit is inconsistent with the language of the statute, which contemplates setting off against the weekly worker's compensation payment amounts received or being received by the employee from the pension or retirement program with respect to the same period for which the weekly worker's compensation benefit is payable. A lump-sum payment is not paid with respect to the same period as weekly worker's compensation benefits are paid. Amortizing the lump-sum amount to be offset over the employee's life expectancy, parallels the offset of amounts received periodically from a pension and retirement program upon normal retirement, and will result in a periodic offset of the lump sum with respect to the same period as the weekly worker's compensation benefit is paid.

4. In *White*, the employer is not entitled to any offset or recoupment in respect to the lump sum withdrawn and immediately rolled over tax free into an IRA. The early withdrawal was not made for current needs or enjoyment, but to protect the lump sum against the vicissitudes of McLouth Steel Products' business and the possible claims of other creditors. Such a tax-free rollover does not create any right in the employer of offset or recoupment. It merely treats the employee in the same way as any other employee entitled to worker's compensation benefits who has a right to elect early withdrawal, but chooses not to do so. In such an event, under the express language of § 354, the employer is not entitled to any offset in respect to benefits that would be payable if the employee had elected early withdrawal. If an employee subsequently opts for early and current use of the funds in an IRA, an employer would be entitled to an offset. By reason of the tax-free aspect of a rollover into an IRA, there is no taxable event, and, hence, no tax or after-tax amount that is received or being received.

5. In *White*, McLouth Steel Products is not the same employer as McLouth Steel Corporation, but a separate entity. Further, the retirement benefit was not received from McLouth Steel Corporation, but rather from Pension Guarantee Corporation, which became obliged to make the payment following McLouth Steel Corporation's bankruptcy.

6. The determination whether a claimed mental disability was significantly contributed to, aggravated, or accelerated by employment, should take into consideration the totality of all the occupational factors, the claimant's health circumstances, and nonoccupational factors. A claimant's preexisting condition does not bar recovery. Actual events of employment, even if ordinary, can be injurious to the mental health of a predisposed individual. In *White*, the magistrate found the plaintiff to be a credible witness and his testimony was supported by the great weight of the credible medi-

cal testimony. As a result of the downsizing of McLouth Steel, there clearly was an actual event, i.e., the change in positions, from one in which the plaintiff felt good about himself to one in which he did not, that was found to have resulted in mental disability.

Remanded.

Justice RILEY, joined by Chief Justice BRICKLEY and Justice WEAVER, dissenting, stated that under MCL 418.354; MSA 17.237(354), an employee's lump-sum pension payment should not be coordinated with weekly worker's compensation payments by amortizing the lump sum over the employee's life expectancy. The statute provides that an employer's worker's compensation liability is to be reduced for virtually any other benefits the worker receives to the extent that the employer paid for the benefits. For pension or retirement benefits under subsection 354(1)(d), there is a reduction in worker's compensation benefits for any payment made from a pension retirement plan. The Legislature's intent would be furthered by adopting a future-credit approach, allowing an employer to coordinate worker's compensation payments to its employee until the after-tax value of the employee's pension benefits has been exhausted, i.e., the employer could cease weekly worker's compensation payments until the pension payment has been fully coordinated. Such an approach would fulfill the goal of eliminating double payments while still guaranteeing a wage-replacement benefit. Moreover, it could be applied to every case as a uniform rule and would not require reliance on a mortality table not provided by the statute.

To apply the future-credit method, the after-tax value of the lump-sum pension payment would first be calculated and then that sum divided by the amount that the employer pays weekly in worker's compensation benefits. The computation would yield the number of weeks that the employer could coordinate the full amount of the weekly worker's compensation benefits. On this basis, the WCAC's decision in *Corbett*, to coordinate pension benefits over fifty-two weeks should be reversed, and instead the employer should be allowed to fully coordinate weekly payment of worker's compensation payments with the lump-sum pension payment. In *Dane*, the WCAC's decision to calculate the coordination on the basis of an annuity should be reversed and Stroh Brewery should be allowed to coordinate the entire weekly payment. *White* should be remanded to the WCAC, for entry of an order consistent with the future-credit approach.

Subsection 354(1)(d) provides that weekly worker's compensation benefits may be reduced by the after-tax amount of the pension or retirement payments received by the employee and does

not condition coordination of pension benefits on whether the employee actually begins to use the funds or invests them in a plan that will yield only later payments. The plain meaning of the statute should be applied, and the Court of Appeals decision that McLouth Steel Products coordinate the lump sum that White received and subsequently rolled over into an IRA should be affirmed.

To receive worker's compensation for mental disability, an employee must establish a mental disability arising out of actual events of employment that contributed to, aggravated, or accelerated the mental disability in a significant manner. The word "significant" should be interpreted to require that the actual events at work be objectively traumatic, even if they would not be injurious to an ordinary person, requiring the employee to allege specific events rather than general assertions of anxiety to ensure that the injury was substantially contributed to, aggravated, or accelerated by actual work-related events, and that the employment environment was not merely the occasion for which the mental disability could become manifest. In applying this test to *White*, the WCAC should be ordered either to allow him an opportunity to allege specific work-related events that affected his mental disability in a significant way or enter an order denying him benefits.

1. WORKER'S COMPENSATION — PENSION BENEFITS — LUMP-SUM DISTRIBUTIONS — COORDINATION.

When a lump sum is withdrawn early from a pension or retirement program, the weekly worker's compensation payment is to be reduced by an amount that will amortize, in equal weekly payments, the proportion of the after-tax amount of the lump sum contributed by the employer over the employee's life expectancy (MCL 418.354; MSA 17.237[354]).

2. WORKER'S COMPENSATION — PENSION BENEFITS — LUMP-SUM DISTRIBUTIONS — COORDINATION.

When a lump sum is withdrawn early from a pension or retirement program and rolled over into an individual retirement account, the employer is not entitled to an offset or reduction in the weekly worker's compensation payment before the earlier of withdrawal from the IRA or the time when payments from the pension or retirement program would have been made had there not been early withdrawal (MCL 418.354; MSA 17.237[354]).

*Robert F. James* for plaintiff Corbett.

*Miller, Cohen, Martens, Ice & Geary, P.C.* (by *Murray A. Gorchow* and *Valencia L. Jarvis*), for plaintiff Dane.

*Levine, Benjamin, Tushman, Bratt, Jerris & Stein, P.C.* (by *Charles P. Burbach*), for plaintiff White.

*Parsons & Bouwkamp, P.C.* (by *Stephen C. Bouwkamp* and *William T. Buie*), for the defendant in *Corbett.*

*Cummings, McClorey, Davis & Acho, P.C.* (by *Daniel J. O'Leary*), for the defendants in *Dane.*

*Lacey & Jones* (by *Gerald M. Marcinkoski*) for the defendants in *White.*

Amici Curiae:

*Daryl Royal* and *Richard E. Shaw* for Michigan Trial Lawyers Association.

*Conklin, Benham, Ducey, Listman & Chuhran, P.C.* (by *Martin L. Critchell*), for Michigan Self-Insurers' Association.

LEVIN, J. The question presented concerns statutory coordination of weekly worker's compensation benefits with a lump sum paid to the employee pursuant to his election for early withdrawal, in full liquidation of his interest, from a pension or retirement program established or maintained by his employer.

The statute[1] provides that the employer's obligation to remit weekly worker's compensation payments shall be reduced by the proportion of payments, "with

---

[1] MCL 418.354; MSA 17.237(354). See n 2 for text.

respect to the same time period" as the worker's compensation payment, from a pension or retirement program represented by the employer's contributions to the program.

We conclude, in *Corbett* and *Dane*, that, when a lump sum is withdrawn early from a pension or retirement program, the weekly worker's compensation payment shall be reduced by an amount that will amortize, in equal weekly payments, the proportion of the after-tax amount of the lump sum contributed by the employer over the employee's life expectancy.

We conclude in *White* that, when a lump sum is withdrawn early from a pension or retirement program and rolled over into an IRA, the employer is not entitled to an offset or reduction in the weekly worker's compensation payment therefor before the earlier of withdrawal from the IRA or the time when payments from the pension or retirement program would have been made had there not been early withdrawal.

We further conclude in *White* that defendant, McLouth Steel Products, is not entitled to a reduction in the weekly worker's compensation payment in respect to amounts paid by the Pension Benefit Guarantee Corporation on account of the pension obligation to the plaintiff employee of the predecessor corporation, McLouth Steel Corporation.

We conclude still further in *White* that the Worker's Compensation Appellate Commission did not err in affirming the magistrate's finding of mental disability.

I

Section 354 of the statute provides that where the weekly worker's compensation payment is "with

respect to the same time period" for which payments from a pension or retirement program are made, the weekly compensation payments shall be reduced by a proportional amount, based on the ratio of the employer's contributions to the total contributions to the program, of the after-tax amount of the pension or retirement payments being received by the employee pursuant to the program.[2]

---

[2] Section 354 provides:

(1) This section is applicable when either weekly or lump sum payments are made to an employee as a result of liability pursuant to section 351, 361 or 835 *with respect to the same time period for which* old-age insurance benefit payments under the social security act, 42 USC 301 to 1397f; payments under a self-insurance plan, a wage continuation plan, or a disability insurance policy provided by the employer; or *pension or retirement payments pursuant to a plan or program established or maintained by the employer, are also received or being received by the employee.* Except as otherwise provided in this section, *the employer's obligation to pay or cause to be paid weekly benefits* other than specific loss benefits under section 361(2) and (3) *shall be reduced by these amounts:*

\*     \*     \*

(e) The proportional amount, based on the ratio of the employer's contributions to the total contributions to the plan or program, of the after-tax amount of the pension or retirement payments received or being received by the employee pursuant to a plan or program established or maintained by the same employer from whom benefits under section 351, 361, or 835 are received, if the employee did contribute directly to the pension or retirement plan or program. Subsequent increases in a pension or retirement program shall not affect the coordination of these benefits.

\*     \*     \*

(2) To satisfy any remaining obligations under section 351, 361, or 835, the employer shall pay or cause to be paid to the employee the balance due in either weekly or lump sum payments after the application of subsection (1).

\*     \*     \*

Section 354 was added in 1981[3] to address the perceived problem of a retired worker receiving, "redundantly," both worker's compensation payments and other payments also funded by the employer.[4] Section

---

(12) *Nothing in this section shall be considered to compel an employee* to apply for early federal social security old-age insurance benefits or *to apply for early or reduced pension or retirement benefits.*

\*    \*    \*

(16) This section shall not apply to payments made to an employee as a result of liability pursuant to section 361(2) and (3) for the specific loss period set forth therein. It is the intent of the legislature that, because benefits under section 361(2) and (3) are benefits which recognize human factors substantially in addition to the wage loss concept, coordination of benefits should not apply to such benefits. [MCL 418.354; MSA 17.237(354) (emphasis added).]

[3] 1981 PA 203. Section 354, as originally enacted, has been amended on a number of occasions.

[4] Theodore J. St. Antoine, the Governor's Special Counsel on Worker's Compensation, stated in his report on *Workers' compensation in Michigan: Costs, benefits, and fairness*, December 12, 1983:

For many years the most hotly discussed topic concerning the Michigan workers' compensation system was the so-called "retiree problem." It was almost unique to this State. Its legal underpinning was the notion developed by the Workers' Compensation Appeal Board, with some support from the judiciary . . . , that a retired worker, even one who had voluntarily retired and gone on a company-funded pension, could still be suffering from a loss of wage earning capacity. If the retiree could demonstrate that he or she had incurred a disability caused by pre-retirement job activity or working environment (a bad back from 30 years on the assembly line or a dust disease from 30 years in a foundry), the retiree was entitled to workers' compensation. It should be emphasized that in many of these cases the disability was undoubtedly genuine, at least in the physical impairment sense, and such an employee would unquestionably be eligible for medical benefits. The fighting issue was whether he was also entitled to recover for wage loss. [*Id.* at 60.]

In *Drouillard v Stroh Brewery Co*, 449 Mich 293, 299-301; 536 NW2d 530 (1995), this Court observed:

354, thus, provides that fifty percent of old-age[5] and disability insurance payments under the Social Security Act,[6] and the proportion of pension, retirement,[7]

---

Because most social legislation in Michigan was implemented in unrelated fragments, failure to coordinate resulted in an accumulation of benefits. For example, before coordination, it was not unusual for an employee to collect both unemployment and worker's compensation benefits at the same time. However, if an employee undergoes a period of wage loss, it does not follow that he should receive multiple wage-loss benefits simultaneously. An employee can experience only one wage loss and, in any logical or coherent system, should receive only one wage-loss benefit at any one time. . . .

As part of the 1981 amendments of the worker's compensation act, the Legislature added § 354, which provides for the coordination of wage-loss benefits. The purpose of this legislation was to prevent duplicate wage-loss payments while maintaining suitable wage-loss benefits. The coordination of worker's compensation and early pension benefits pursuant to § 354 presents a complicated set of issues previously only considered by the Court of Appeals.

[5] See n 2, subsection 354(1). Subsection 354(1)(a) set forth immediately after the concluding words of subsection 1, "shall be reduced by these amounts," provides:

Fifty percent of the amount of the old-age insurance benefits received or being received under the social security act.

[6] Subsection 354(11) provides:

Disability insurance benefit payments under the social security act shall be considered to be payments from funds provided by the employer and to be primary payments on the employer's obligation under section 351, 361, or 835 as old-age benefit payments under the social security act are considered pursuant to this section. The coordination of social security disability benefits shall commence on the date of the award certificate of the social security disability benefits. Any accrued social security disability benefits shall not be coordinated. However, social security disability insurance benefits shall only be so considered if section 224 of the social security act, 42 USC 424a, is revised so that a reduction of social security disability insurance benefits is not made because of the receipt of worker's compensation benefits by the employee.

[7] See n 2 for the text of subsection 354(1)(e), applicable where, as here, both the employer and the employee contribute to the pension or retirement program.

and profit sharing[8] and other payments funded by the employer,[9] shall be coordinated with and shall reduce the weekly worker's compensation payment due from the employer.

II

In *Corbett,* the Worker's Compensation Appeal Board affirmed the magistrate's decision to coordinate over a one-year period by reducing the weekly compensation payment by 1/52 of the amount of the

---

Subsection 354(1)(d), applicable when the employee does not contribute directly to the pension or retirement program, provides:

> The after-tax amount of the pension or retirement payments received or being received pursuant to a plan or program established or maintained by the same employer from whom benefits under section 351, 361, or 835 are received, if the employee did not contribute directly to the pension or retirement plan or program. Subsequent increases in a pension or retirement program shall not affect the coordination of these benefits.

[8] Subsection 354(1)(f), set forth after the concluding words of subsection 1, "shall be reduced by these amounts," provides:

> For those employers who do not provide a pension plan, the proportional amount, based on the ratio of the employer's contributions to the total contributions made to a qualified profit sharing plan under section 401(a) of the internal revenue code or any successor to section 401(1) of the internal revenue code covering a profit sharing plan which provides for the payment of benefits only upon retirement, disability, death, or other separation of employment to the extent that benefits are vested under the plan.

[9] See, e.g., subsection 354(1)(c) which provides:

> The proportional amount, based on the ratio of the employer's contributions to the total insurance premiums for the policy period involved, of the after-tax amount of the payments received or being received by the employee pursuant to a disability insurance policy provided by the same employer from whom benefits under section 351, 361, or 835 are received, if the employee did contribute directly to the payment of premiums regarding the disability insurance policy.

lump sum attributable to the employer's contributions.[10]

In *Dane*, the WCAC affirmed the magistrate's decision to coordinate by reducing the weekly compensation payment by the amount the employee would have received if he had used the lump sum to purchase an annuity.[11]

---

[10] Shawn Corbett began working as a police officer for Plymouth Township on June 17, 1985. He was injured in a motor vehicle accident while responding to an armed robbery at a local bank on February 16, 1987. He sustained a fractured right leg and a laceration on his chin. Corbett returned to work as a police officer on July 15, 1987. Although he was physically able to perform his normal duties, he left work on July 16, 1988, because of a psychiatric disorder resulting from the automobile accident.

On August 8, 1990, the magistrate granted Corbett an open award of $283.02 a week for his work-related emotional disability.

On March 5, 1991, Corbett cashed out his pension and received the lump sum of $14,778.56. His employer, Plymouth Township, had contributed $10,975.93 of that amount to the pension plan pursuant to the collective bargaining agreement.

The magistrate ruled that Plymouth Township could coordinate the employer-funded portion of the pension distribution, $10,975.93. This amount was to be coordinated over fifty-two weeks by reducing Corbett's worker's compensation benefits by $161.20 to allow for coordination of the entire after-tax benefits of $8,386.03. Coordination was ordered to begin from the date of the decision, April 1, 1992.

Corbett appealed to the WCAB which affirmed the magistrate's order in a two-to-one decision dated September 30, 1992. The Court of Appeals denied leave to appeal.

[11] Dennis Dane began working for the Stroh Brewery Company on June 7, 1971. Dane sustained a work-related injury of his left shoulder on July 26, 1984. He experienced an aggravation of his shoulder injury while working on March 14, 1985. Dane last worked for Stroh Brewery on March 14, 1985, at which time he was thirty-four years old.

The Stroh Brewery plant was permanently closed on May 31, 1985. Dane received $29,505 on March 3, 1986, in a lump-sum distribution of his interest in the Stroh retirement fund.

Dane obtained an open award of worker's compensation benefits for his left shoulder injury on January 21, 1988. The magistrate ruled that the pension distribution received by Dane should be coordinated with his worker's compensation benefits on the basis of the amount he would have received if he had used the pension monies to purchase an annuity. Coordination would begin from the date the pension distribution was received.

In *White*, the employee rolled over the lump sum into an investment retirement account in a tax-free exchange and contended that there should not be any reduction in the weekly worker's compensation payment because he did not retain the lump sum and further receipt of benefits will be deferred until he withdraws money from the IRA. The WCAC did not address the issue of coordination. The Court of Appeals agreed with the defendant employer, McLouth Steel Products, that the lump-sum payment was subject to coordination, but did not address the manner in which this should be accomplished.[12]

---

Stroh Brewery appealed the magistrate's award of benefits. Dane appealed the order of coordination. The Worker's Compensation Appeal Board affirmed the magistrate's decision on June 14, 1991. The Court of Appeals denied leave to appeal.

[12] Willis White began working for McLouth Steel Corporation, the predecessor of defendant McLouth Steel Products in 1954. McLouth Steel Corporation or its assets were sold and McLouth Steel Products was formed in 1982. When this occurred, the plaintiff was terminated as an employee of McLouth Steel Corporation and hired as an employee of McLouth Steel Products.

White's last day of work with McLouth Steel Products was January 15, 1989. On June 29, 1990, at fifty-eight, he received $13,039.94 as a lump-sum pension distribution from McLouth Steel Products. White deposited this sum into an IRA.

White obtained an open award of benefits for mental disability against McLouth Steel Products on September 30, 1990. At the time of the award, White was receiving pension payments from McLouth Steel Corporation. The magistrate denied coordination of worker's compensation benefits with White's pension benefits from both employers.

The WCAC affirmed the award, but ordered coordination, under § 354, of the $13,039.94 lump-sum payout of accrued pension benefits from McLouth Steel Products.

The Court of Appeals vacated the decision and remanded for reconsideration of the finding of disability. The WCAC, on remand, denied all benefits. The Court of Appeals then vacated the decision of the WCAC and remanded for reconsideration in light of this Court's decision in *Gardner v Van Buren Public Schools*, 445 Mich 23; 517 NW2d 1 (1994). On remand, the WCAC granted an open award of benefits and denied coordination against the pension received from McLouth Steel Corporation. The WCAC, however, did not address the issue of coordination of the worker's

### III

Coordination of weekly worker's compensation payments with weekly, monthly, or other periodic payments from a pension or retirement program does not appear to have presented difficult issues of coordination of the amount by which a weekly worker's compensation payment is to be reduced. The instant cases, however, concern coordination with a lump sum paid at the employee's election for early withdrawal from the program before "normal" retirement.

The plaintiff employee in *Corbett* contends that the weekly worker's compensation payment due in the week in which the lump sum was "received" should be reduced in its entirety, but not below zero, and that there should be no reduction whatsoever in succeeding weeks.[13] He argues that it is only in the week that the lump sum is actually received that any amount is "*received* or being *received* by the employee" pursuant to the pension or retirement program (emphasis added).

---

compensation benefits and the lump-sum pension payment distributed by defendant McLouth Steel Products.

The Court of Appeals affirmed in part and reversed in part, holding that there was evidence supporting the decision regarding White's mental disability. It affirmed the WCAC's holding that the defendants were not entitled to coordination of pension benefits paid on behalf of McLouth Steel Corporation. It further held that payments made by defendant McLouth Steel Products' pension plan, including the lump-sum distribution and payments pursuant to a salary or wage continuation program, should be coordinated with the worker's compensation benefits.

[13] Subsection 354(8) provides:

> Except as provided in subsections (4), (5) and (6), a credit or reduction of benefits otherwise payable for any week shall not be taken under this section until there has been a determination of the benefit amount otherwise payable to the employee under section 351, 361, or 835 and the employee has begun receiving the benefit payments.

The defendant employer in *Dane* and *White* contends that coordination should be accomplished by eliminating all weekly worker's compensation payments entirely until the sum of all weekly compensation payments so eliminated aggregate the amount of the lump sum withdrawn, whereupon the employer would be obliged to resume making weekly compensation payments.[14]

While the opening clauses of subsection 354(1) expressly refer to "weekly or lump sum payments" of worker's compensation benefits, there is no express reference to lump-sum payments of pension or retirement benefits. The Legislature was, however, aware of the possibility of "early or reduced pension or retirement benefits." Subsection 12 provides that an employee is not obliged to apply for early or reduced retirement benefits.[15] But it does not appear from this language whether the Legislature recognized the possibility of *lump-sum payment* of early or reduced pension or retirement benefits. In all events, the Legislature did not expressly provide for the manner of coordinating lump-sum payments on early withdrawal from a pension or retirement program.

Because the Legislature provided no express guidance concerning statutory coordination of weekly worker's compensation benefits with a lump sum paid to the employee pursuant to his election of early withdrawal, we turn to a consideration of what would constitute the most appropriate construction of the statute. We approach this task in an effort to *"do,*

---

[14] The employer in *Corbett* advocates coordination over the fifty-two week period chosen by the magistrate.

[15] See n 2 for text.

responsibly, fittingly, intelligently, with and within the given frame."[16]

Worker's compensation benefits are social welfare wage-replacement benefits for workers whose injuries arise out of and in the course of their employment. Such benefits are normally paid weekly. The amount of the award is based on the injured worker's average weekly wage.[17] These payments function as current wage replacement, and an award generally extends for the duration of the disability.[18] The statutory scheme includes an implicit assumption that the disability may continue over the employee's lifetime. In *Drouillard v Stroh Brewery Co*, 449 Mich 293, 299; 563 NW2d 530 (1995), this Court observed:

> Worker's compensation is one unit in a loosely connected system of wage-loss protection that also includes unemployment compensation, social security old-age, disability, and survivors benefits, aid to families with dependent children, and general assistance. *Franks v White Pine Copper Div*, 422 Mich 636, 654; 375 NW2d 715 (1985). Such wage-loss legislation is designed to restore to employees a portion of wages lost because of three major causes of wage loss: physical disability, unemployment, and old age. The crucial

---

[16] It is well established that "[t]he cardinal rule of statutory construction is to discern and give effect to the intent of the Legislature." *Murphy v Michigan Bell Telephone Co*, 447 Mich 93, 98; 523 NW2d 310 (1994).

But, as Karl Llewellyn observed, only infrequently "a legislative intent with some concrete reality can be uncovered in circumstance or legislative history. For the rest, the court's work is not to *find*, any more than it is with case law. It is to *do*, responsibly, fittingly, intelligently, with and within the given frame." [*People v McFarlin*, 389 Mich 557, 564; 208 NW2d 504 (1973), quoting with approval Llewellyn, The Common Law Tradition, Deciding Appeals, p 382.]

[17] MCL 418.364; MSA 17.237(364).
[18] MCL 418.351(1) and 418.361(1); MSA 17.237(351)(1) and 17.237(361)(1).

operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. See, generally, 4 Larson, Workmen's Compensation, § 97, p 18-9 (1995 Supp, p 106).

Retirement benefits are also elements of the compensation package, and employees work for years and sometimes an entire lifetime in partial consideration of anticipated retirement benefits. Retirement benefits are normally distributed monthly. Benefits are calculated and distributed in accordance with the retirement program and the retiree's life expectancy. Retirement plans generally provide for regular payments in a fixed amount to the retiree for life.

We conclude, essentially agreeing with the plaintiff employee in *Dane* and the alternative contention of the employee in *Corbett*,[19] that, where a lump sum is received on early withdrawal, weekly compensation payments should be reduced by an amount that will amortize,[20] in equal weekly payments, the amount to be offset over the employee's life expectancy.[21]

We thus have also concluded, as has the Court of Appeals,[22] that the Legislature did not intend to limit the reduction in the weekly compensation payment to only the week in which the lump sum is actually

[19] The WCAC has, in subsequent cases, concluded that the life-expectancy method of coordination of an early withdrawn lump-sum payment is the correct method of coordination. See, e.g., *Bullock v Stroh's Inc*, 1995 Mich ACO 1986, *Leavitt v Proctor & Gamble Paper Products Co*, 1993 Mich ACO 1684, *Keiser v Proctor & Gamble Paper Products Co*, 1993 Mich ACO 1689, and *Shoults v Proctor & Gamble Paper Products Co*, 1993 Mich ACO 1694.

[20] Without interest.

[21] Or such shorter period as may be provided for in the pension or retirement program.

[22] *Drouillard v Stroh Brewery Co*, 199 Mich App 67; 501 NW2d 229 (1993).

"received." And we thus have also rejected the defendant employers' contention, at the other extreme, that the weekly compensation payment is to be eliminated entirely until the aggregate of the weekly compensation payments equals the lump sum withdrawn.

IV

We are unpersuaded by the defendant employers' contention that we should disallow spreading the recoupment of the lump sum over the employees' life expectancy because defendant employers then may not recover the full amount of the offset as a result of either the employee recovering from his disability and returning to work or the employee's death.[23]

The defendant employers' argument ignores that § 354 provides that nothing in § 354 shall be "considered to compel an employee to apply" for "early or reduced pension or retirement benefits,"[24] and that it

---

[23] Which, parenthetically, also brings to a conclusion the employer's obligation to pay weekly worker's compensation benefits.

[24] Subsection 354(12). See n 2 for text.

In *Drouillard, supra* at 295, this Court held that this provision "does not preclude coordination where an employee is required to accept early pension benefits."

The plaintiffs had contended "that subsection 354(12) precludes coordination in all cases in which an employer 'compels' employees to accept early retirement or pension benefits." This Court responded:

> We first note that it is not clear that plaintiffs were compelled to accept early retirement benefits. It is apparent that plaintiffs were told that the more expedient course would be to accept their pension benefits. However, it is also true that this was general advice to a disparate audience and plaintiffs were specifically instructed to seek legal advice if they had questions. However, even accepting arguendo plaintiffs' contention that they were compelled to accept early pension benefits, we believe that the conclusion that subsection 354(12) thereby precludes coordination only follows from a forced reading of the statute. [*Id.* at 302.]

is only because of the fortuity of the employee elect-ing early withdrawal that there is any employer claim under § 354 for early reduction, before normal retire-ment, of weekly worker's compensation payments.

The paradigm case contemplated by the Legislature in addressing the "retiree problem" was weekly pay-ments to a retired employee from a pension or retire-ment program funded by the employer redundant of weekly worker's compensation payments also funded by the employer.[25]

Had the employees in the instant cases not elected early withdrawal, there would have been no amount to be offset before the employees' "normal" retire-ment, at which time, if the pension or retirement ben-efit were payable over the employees' remaining life-time, the offset would then for the first time become applicable to any weekly worker's compensation ben-efit then being payable. If the disabled employee had, before normal retirement, recovered from his disabil-ity, returned to work, or died, the employer would have been required to pay full worker's compensation benefits weekly until such recovery, return to work, or death without any reduction in respect to the accruing and potential pension and retirement benefits.

---

This Court concluded that subsection 354(1)(d) "was not written to apply to all cases in which an employee is required or 'compelled' to accept early retirement benefits." *Id.* at 305.

[25] Arguably, although the plaintiff employees do not so argue, the lump sum, although received by the employee upon early withdrawal, does not become an offset until normal retirement, at which time, for the first time, if the employee is still receiving weekly worker's compensation payments when he so normally retires, the weekly worker's compensation benefit would be reduced by the weekly payment from the pension or retirement fund that the employee would have received had he not elected early withdrawal.

The defendant employer in *Dane*, Stroh Brewery Company, contends that "there is only one method where the legislative objective would be attained with certainty in every case: that the after-tax amount of the pension be utilized as a future credit toward the employer's obligation to pay weekly benefits." The defendant employer in *White*, McLouth Steel Products, similarly argues.[26]

The defendant employers, thus, would have this Court read into § 354 the concept set forth in subsection 827(5) of the act,[27] concerning recoveries of damages from a third party. Subsection 827(5) provides that a third-party recovery shall first reimburse the employer for benefits previously paid under the act, and that the balance paid to the employee—much like the lump-sum early withdrawal from a pension or retirement program—"shall be treated as an advance

---

[26] McLouth Steel Products argues:

[I]f the after-tax amount of the lump sum (as calculated with reference to Bureau tables) exceeds the weekly amount of compensation owing, then no workers' compensation benefits are payable until the after-tax amount of the lump sum pension is exhausted. Once it is exhausted, then full workers' compensation benefits automatically resume.

[27] Subsection 827(5) provides:

In an action to enforce the liability of a third party, the plaintiff may recover any amount which the employee or his or her dependents or personal representative would be entitled to recover in an action in tort. Any recovery against the third party for damages resulting from personal injuries or death only, after deducting expenses of recovery, shall first reimburse the employer or carrier for any amounts paid or payable under this act to date of recovery and the balance shall immediately be paid to the employee or his or her dependents or personal representative and shall be treated as an advance payment by the employer on account of any future payments of compensation benefits. [MCL 418.827(5); MSA 17.237(827)(5).]

payment by the employer on account of any future payments of compensation benefits." The Legislature, thus, understands how to express the concept the defendant employers would have this Court read into the statute of treating an early lump-sum withdrawal as a future credit, cutting off all weekly payments of worker's compensation benefits until the amount of such future credit is exhausted.

The concept of a future credit is inconsistent with the language of the statute, which contemplates offsetting against the weekly worker's compensation payment amounts "received or being received by the employee" from the pension or retirement program "with respect to the same time period for which" the weekly worker's compensation benefit is · payable. Clearly, the Legislature contemplated offsetting periodic payments from a pension or retirement program payable during "normal" retirement of the employee, payments that would be "received" by the employee "with respect to the same time period" as the weekly worker's compensation payment. A lump-sum payment is not paid with respect to the same period as weekly worker's compensation benefits are paid.

Amortizing the lump-sum amount to be offset over the employee's life expectancy, parallels the offset of amounts received periodically from a pension and retirement program upon normal retirement, and will result in a periodic offset of the lump sum "with respect to the same time period" as the weekly worker's compensation benefit is paid.

V

Similarly, we agree with the plaintiff employee in *White* that the defendant employer in that case is not

entitled to any offset or recoupment in respect to the lump sum withdrawn and immediately rolled over tax free into an IRA.

The defendant employer stresses that the lump sum was "received," the triggering event under the statute, and that § 354 does not provide for deferral of offset merely because the Internal Revenue Code permits a tax-free rollover into an IRA. This is the same literalism employed by the plaintiff employee in *Corbett*, who would limit the offset to the week in which the lump-sum payment is actually received, and which would deny an employer any offset because the lump-sum payment was not paid for any "time period," let alone "with respect to the same time period for which" the weekly worker's compensation benefit is paid.

The early withdrawal in *White* was not made with the intention of using the proceeds for current needs or enjoyment. Early withdrawal protected the lump sum so withdrawn against the vicissitudes of the defendant McLouth Steel Products' business and the possible claims of other creditors.

In *Drouillard, supra* at 295, this Court held that this provision "does not preclude coordination where an employee is required to accept early pension benefits." We did not address the question how benefits would be coordinated. On remand, the WCAC adopted coordination over the life expectancy of the retired worker.[28]

---

[28] *Drouillard v Stroh Brewery Co*, 1996 Mich ACO 235.

Some of the Stroh employees rolled over a portion of the lump sum they were constrained to receive into an IRA account.[29]

It is asserted in *Corbett* that the plaintiff employee in that case acted without the advice of counsel, and without awareness that early withdrawal might reduce his worker's compensation benefit. Regardless of whether that is true, under the circumstance that the employee is under no obligation to reduce the employer's obligation to make weekly worker's compensation payments by electing early withdrawal, we see no reason why an employee who has elected early withdrawal should not, during the short sixty-day time for a tax-free rollover, be able to deny the employer the benefit of an offset in respect to the rolled over amount until such time as the employee would have been obliged to accept payment from the pension or retirement program had he not elected early withdrawal. This would, in almost every case, be far earlier than the calendar year in which the employee reaches seventy and one-half,[30] when amounts deposited in an IRA must begin to be included in taxable income.

The defendant employer in *White* has set forth a parade of horribles that we have carefully examined and have concluded do not militate against the construction we have adopted. The reason why there are possible unresolved problems is simply because the Legislature did not expressly address the offset of lump-sum payments on early withdrawal, long before

---

[29] See n 32.
[30] 26 USC 408.

normal retirement, in the language employed by it in addressing the retiree problem.

We note, however, that § 354 provides that an employee shall provide the employer with authority for release of information from the Social Security Administration.[31] In that spirit, the employee in *White* is obliged periodically, upon request of the employer, to furnish the employer with information showing whether there has been withdrawal from the IRA, and to facilitate direct inquiry and verification by the employer of and from whoever is administering the IRA.

Our conclusion that such a tax-free rollover does not create any right in the defendant employer of offset or recoupment merely treats the employee in such a case in the same way as any other employee, entitled to worker's compensation benefits, who has a right to elect early withdrawal but chooses not to do so, in which event, under the express language of § 354, the employer is not entitled to any offset in respect to benefits that would be payable if the employee had elected early withdrawal.[32]

To be sure, the employee can subsequently opt for early and current use of the funds in an IRA, but, if he does so, the employer would henceforth be entitled to an offset the same as would occur whenever an employee who is injured defers, by declining early

---

[31] MCL 418.354(3)-(6); MSA 17.237(354)(3)-(6).

[32] In a similar case, *McCallum v Stroh Brewery Co*, 213 Mich App 542, 545; 540 NW2d 483 (1995), the Court of Appeals agreed with the plaintiff that coordination should be deferred until he begins withdrawing funds from the IRA, because the payments then will act as "the functional equivalent of pension benefits."

withdrawal and later exercises rights of early with-drawal under a pension or retirement program.

The construction that we adopt is consistent with the language of the statute, which provides for an off-set "of the *after-tax* amount of the pension or retire-ment payments received or being received by the employee . . . ."[33] (Emphasis added.) By reason of the tax-free aspect of a rollover into an IRA, there is no taxable event and, hence, no tax or "after-tax amount" that is "received or being received."

VI

There are two other issues in *White*. We now address defendant McLouth Steel Products' conten-tion that it is entitled to a reduction in the weekly worker's compensation payment in respect to amounts paid by the Pension Benefit Guarantee Cor-poration on account of the pension obligation to the plaintiff employee of the predecessor corporation, McLouth Steel Corporation.

McLouth Steel Products contends that for all practi-cal purposes McLouth Steel Corporation was the same employer as McLouth Steel Products as exem-plified by the employee's rehiring by McLouth Steel Products on the same day his employment with McLouth Steel Corporation was terminated, and by the continuation of his seniority.

We are unpersuaded. McLouth Steel Products is not the same employer as McLouth Steel Corporation, but a separate entity. Further, the retirement benefit was not received from McLouth Steel Corporation, but rather from Pension Guarantee Corporation, which

---

[33] Subsection 354(1)(e).

became obligated to make the payment following McLouth Steel Corporation's bankruptcy.

VII

We turn to a consideration of defendant McLouth Steel Products' further contention in *White* that the WCAC erred in affirming the magistrate's finding of mental disability.

A

The magistrate found that White had proved by a preponderance of the evidence a mental disability arising out of and in the course of his employment. The WCAC and the Court of Appeals affirmed.[34]

McLouth Steel contends that the magistrate, the WCAC, and the Court of Appeals failed to follow this Court's decision in *Gardner v Van Buren Public Schools*, 445 Mich 23; 517 NW2d 1 (1994), where this Court construed, for the first time in the mental disability context, a 1980 amendment[35] of the worker's compensation act adding definitions[36] and the limitation that mental disabilities are compensable only if "arising out of actual events of employment," and that mental disabilities and heart and cardiovascular conditions are only "compensable if contributed to or aggravated or accelerated by the employment in a significant manner."[37]

---

[34] See n 12 for the history of the proceedings including two remands to the WCAC.

[35] 1980 PA 357.

[36] Personal injury is defined in subsection 401(2)(b). MCL 418.401(2)(b); MSA 17.237(401)(2)(b), also includes the language set forth in n 37.

[37] Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions, shall be compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental disabilities shall be

McLouth Steel asserts that the magistrate, the WCAC, and the Court of Appeals erred in failing to consider White's predisposition to mental illness and his pre-existing mental framework as a nonoccupational factor in determining whether the claimed mental disability was contributed to, aggravated, or accelerated by the employment in a significant manner. We find no error.

B

This Court, before *Gardner*, considered the 1980 amendment in the heart injury context, in *Farrington v Total Petroleum*, 442 Mich 201, 216-217; 501 NW2d 76 (1993). The Court there declared:

> The heart injury must be significantly caused or aggravated by employment considering the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors.[17]

[17]Even though a claimant's everyday work activities might contribute to a heart injury in a significant manner, a factfinder must also consider the causal effect of everyday work activities in relation to the claimant's other, nonoccupational factors. These factors would include, for example, age, weight, diet, previous cardiac ailments or injuries, genetic predispositions, and the claimant's consumption of alcohol and use of tobacco or other drugs.

In *Gardner*, the concept, so stated in *Farrington*, that the determination whether the claimed injury

compensable when arising out of actual events of employment, not unfounded perceptions thereof. [MCL 418.301(2); MSA 17.237(301)(2).]

was significantly contributed to, aggravated, or accelerated by the employment, should take into consideration the totality of all the occupational factors and the claimant's health circumstances and nonoccupational factors, was held to be applicable in mental disability cases as well.[38]

The Court, in *Gardner, supra* at 48, observed, however, that "it is well established that employers take employees as they find them, with all *preexisting mental and physical frailties. A* claimant's *preexisting condition does not bar recovery . . . .*" (Emphasis added.) The Court said that "[a]bsent an explicit legislative mandate, mental disabilities should not be treated differently," with the result that the inquiry is whether the claimant *"regardless of preexisting conditions,* sustained an injury that arose out of and in

---

[38] In determining whether specific events of employment contribute to, aggravate, or accelerate a mental disability in a significant manner, the factfinder must consider the totality of the occupational circumstances along with the totality of a claimant's mental health in general.

The analysis must focus on whether actual events of employment affected the mental health of the claimant in a significant manner. This analysis will, by necessity, require a comparison of non-employment and employment factors. Once actual employment events have been shown to have occurred, the significance of those events to the particular claimant must be judged against all the circumstances to determine whether the resulting mental disability is compensable.[9]

---

[9] In making this determination, medical evidence establishing the relationship between the event and the disability may play an important role.

---

[*Id.* at 47.]

the course of employment."[39] *Id.* at 48-49. (Emphasis added.)

The Court, in *Gardner*, continued with this analysis stating that it recognized "that actual events of employment, even if 'ordinary,' can be injurious to the mental health of a *predisposed individual*," although the statute, as amended in 1980, excluded " 'unfounded perceptions' of the actual events of employment . . . ." The Court declared:

> [T]he causal connection must be objectively established given a particular claimant's preexisting mental frailties. However, by *focusing on the individual worker, as opposed to an average worker*, both the significant manner requirement and the actual events requirement also have substantial subjective elements. [*Id.* at 49-50 (emphasis added).]

In conclusion, the Court, in *Gardner*, declared:

---

[39] Worker's compensation law in this state has also recognized that even the most trivial physical event can lead to a compensable physical injury. *Zaremba v Chrysler Corp*, 377 Mich 226, 231; 139 NW2d 745 (1966). The issue is not whether a person of "reasonable" or "average" health would have been injured. It is whether a specific individual, regardless of preexisting conditions, sustained an injury that arose out of, and in the course of employment. Absent an explicit legislative mandate, mental disabilities should not be treated differently.[10]

[10]We note that the very language of the provision (i.e., "contribute," "aggravate," "accelerate") presupposes a preexisting mental disability. After all, a mental disability must first exist before actual events of employment may "contribute" to it, "accelerate" it, or "aggravate" it.

[*Id.* at 48-49.]

It is, therefore, *irrelevant how a "reasonable" person would react to the objectively established actual events.* The relevant inquiry, and the only inquiry presently required by worker's compensation law in this state, is: Did the actual events of employment occur, and do these bear a significant relationship to the mental disabilities? Reduced to its simplest form, the analysis is this: Given actual events and a particular claimant, with all the claimant's preexisting mental frailties, can the actual events objectively be said to have contributed to, aggravated, or accelerated the claimant's mental disability in a significant manner? [*Id.* at 50 (emphasis added).]

C

The magistrate found White to be a credible witness. White was informed by McLouth Steel in February, 1988, that his job as a storage foreman was being eliminated, and that he had the choice of being laid off or accepting a position as a masonry foreman.

White was nervous about his responsibility as a masonry foreman for protecting the safety of his men because scaffolds and ladders were involved, and he knew nothing about such matters. He was depressed because he did not know his job. "He could not sleep at night, had diarrhea, and began to experience memory loss." Sometime after January 16, 1989, he was unable to work, and retired, but the symptoms continued.

The magistrate further found that White's testimony was supported by the great weight of the credible medical testimony. An examining psychiatrist had diagnosed him as having a "major affective disorder with depression. He also characterized plaintiff as an obsessive-compulsive personality and observed that he suffers from diarrhea and psychosocial stressors."

The psychiatrist concluded that White was disabled and unable to return to his previous occupational duties.[40]

The WCAC, on remand from the Court of Appeals, following this Court's decision in *Gardner*, declared:

> "The relevant inquiry, and the only inquiry presently required by workers' compensation law in this state, is: Did the actual events of employment occur, and do these bear a significant relationship to the mental disabilities? Reduced to its simplest form, the analysis is this: Given actual events and a particular claimant, with all of the claimant's preexisting mental frailties, can the actual events objectively be said to have contributed to, aggravated, or accelerated the claimant's mental disability in a significant manner?"
>
> Under the *Gardner* criteria, there is competent, material, and substantial evidence on the whole record to support the Magistrate's finding of disability. Actual events occurred at the workplace; they were significant when compared to nonwork-related stressors; they can objectively be said to have contributed to, aggravated, or accelerated the claimant's mental disability in a significant manner. Furthermore, the Magistrate's conclusions of law need not be clarified or corrected. The Magistrate's decision awarding benefits is affirmed. [1994 Mich ACO 2680, 2683.]

D

McLouth Steel focuses on footnote seventeen of *Farrington* and the words "previous cardiac ailments or injuries, genetic predispositions," in contending that the magistrate, the WCAC, and the Court of Appeals failed to accord sufficient consideration to White's predisposition to mental illness and his pre-

---

[40] The magistrate also found that White had sustained his burden of proof of mental disability within the meaning of subsection 301(2), that he had proven that his condition was "contributed to or aggravated or accelerated by the employment in a significant manner."

existing mental framework—described as "an obses-sive-compulsive personality" type—rendering him unable to cope with ordinary changes or occurrences in his work environment, as a nonoccupational factor in determining whether his claimed mental disability was contributed to, aggravated, or accelerated by the employment in a significant manner.

We have already indicated that this Court ruled in *Gardner* that preexisting mental and physical frailties and conditions do not bar recovery. Footnote seven-teen contemplated a comparison of a claimed heart injury with a prior cardiac ailment or injury and genetic predispositions. There is no evidence that White had psychiatric episodes before the disabling episode found by the magistrate to have arisen out of his employment. Nor is there evidence that he had a genetic predisposition to psychiatric episodes or injuries.

The WCAC adverted to the correct passage in *Gard-ner* in directing its inquiry to the "particular claimant, with all of the claimant's preexisting mental frailties." The WCAC's failure to identify, once again, and to restate what the magistrate had so clearly stated, rec-ognizing White's underlying personality type, does not evidence a failure to consider the claimant's "preexist-ing mental frailties" in deciding whether the work stimuli could objectively be said to have contributed to, aggravated, or accelerated the claimant's mental disability in a significant manner.

Finally, McLouth Steel complains that the magis-trate, the WCAC, and the Court of Appeals may have taken into consideration, as an actual event of employment, White's erroneous belief that he had lost his McLouth Steel pension, and his depression con-

cerning the changeover from McLouth Steel Corporation to McLouth Steel Products.

McLouth Steel cites cases that hold that a mental injury arising from loss of employment cannot logically arise out of and in the course of employment. But, assuming that the magistrate, the WCAC and the Court of Appeals relied on White's depression respecting the changeover, this case would not concern an actual loss of employment.[41] The question presented would then still be whether there was an actual event respecting the changeover.

There clearly was, as a result of the downsizing of McLouth Steel, an actual event. White was constrained to accept a transfer from a job that he felt adequate in performing to one in which he felt inadequate. It was that actual event, the change in positions, from one in which he felt good about himself to one in which he did not, arising out of the downsizing, that was found to have resulted in mental disability.

The cases are remanded to the WCAC for further consideration consistent with this opinion.

CAVANAGH, BOYLE, and MALLETT, JJ., concurred with LEVIN, J.

RILEY, J. (*dissenting*). I cannot agree with the majority's interpretation of MCL 418.354; MSA 17.237(354) that (1) an employee's lump-sum pension payment is coordinated with his weekly worker's compensation payments by amortizing the lump sum over his life expectancy, and (2) an employer cannot coordinate an employee's lump-sum payment from a

---

[41] As McLouth Steel itself stresses.

pension that he places into an Individual Retirement Account (IRA) until the time he would have been obliged to accept payment under his pension or retirement program if he had not cashed out his pension. Although I appreciate the difficulty in applying the language of § 354 to these cases, I do not believe that the majority is adequately faithful to the language and the intent of the statute.[1] Moreover, I do not agree with the majority's conclusion that Willis White's inability to work because of his affective disorder was "contributed to or aggravated or accelerated by the employment in a *significant* manner" under MCL 418.301(2); MSA 17.237(301)(2). (Emphasis added.)

I

The statute provides that an "employer's obligation to pay or cause to be paid weekly [worker's compensation] benefits . . . [is] reduced" by the after-tax amount of "the pension or retirement payments received," and this section is applicable for worker's compensation payments made during the "same time period" as when pension or retirement payments are received. See subsection 354(1)(d). There is only one method of coordination that fully comports with the language of the statute: coordinating the worker's compensation benefits for only that week in which the employee received the lump-sum pension payment. According to this interpretation, the employer would only reduce one week of worker's compensation payments. Although this interpretation fits the

---

[1] I do agree with part VI of the opinion that McLouth Steel Corporation, the predecessor corporation, is not the "same employer" under subsection 354(1)(d) as defendant McLouth Steel Products.

plain meaning of the section, this Court should reject it because it would produce an absurd result by frustrating the undisputed purpose of the statute, i.e., to eliminate duplicate wage-loss payments while maintaining adequate wage-loss benefits for disabled workers. *Drouillard v Stroh Brewery Co*, 449 Mich 293, 299-300; 536 NW2d 530 (1995).[2] The Legislature could not have intended to coordinate a lump-sum pension payment with weekly payments of worker's compensation benefits, see *id.* at 298, 305, but simultaneously only intended to coordinate the double wage-loss income to that week in which the lump-sum pension payment was received. This would effectively nullify the purpose of the statute. Like the majority, I believe that we must avoid this understanding, despite the apparently clear language of the statute.[3] See *Salas v Clements*, 399 Mich 103, 109; 247 NW2d 889 (1976).[4]

---

[2] As this Court noted, the Legislature wished to correct a system that " 'discourag[ed] some disabled employees from returning to work' " by providing " 'wage-loss benefits from two, three, or four different programs providing a total wage "replacement" greater than the wages the employee earned while on the job . . . .' " *Drouillard, supra* at 300, n 1, quoting Senate Legislative Analysis, SB 595 (January 7, 1982).

[3] The Court of Appeals drew the same conclusion in *Drouillard v Stroh Brewery Co*, 199 Mich App 67, 70-71; 501 NW2d 229 (1993):

Drouillard contends that, in coordinating these benefits, the credit for the lump-sum pension payment may not be allocated to Stroh's workers' compensation liability for weeks other than the week in which the payout was actually received, i.e., in effect, that it should be coordinated only for the week it was received. We disagree. Rather, coordination of the entire amount is required by § 354(1)(d); to accomplish the reduction in an employer's obligation as required by that section, coordination must be allowed to continue in order to cover the full after-tax amount of the pension being received.

[4] "[W]e must keep in mind the fundamental rule of statutory construction that departure from the literal construction of a statute is justified

After concluding that this approach was unworkable,[5] the majority adopts a life-expectancy approach because the "Legislature contemplated offsetting periodic payments from a pension or retirement program payable during 'normal' retirement of the employee" with respect to payments during the same period. *Ante* at 543. Although I agree that this was the expectation of the Legislature, I disagree that this allows the Court to adopt a life-expectancy approach where the statute does not establish, or refer to, a table to calculate an employee's life expectancy.[6]

Under the life-expectancy approach, the Court pretends that the employee is only receiving a small amount of his pension payment periodically, despite the fact that he has received the entire amount and may be spending it or may have placed it into another retirement account as a financial investment. Moreover, the employee who elects to receive his lump-sum pension payment while still relatively young will have only a tiny percentage of his pension payment coordinated with his worker's compensation payments. The facts of these cases illustrate this point.

---

when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question."

[5] The majority states that in seeking to uncover "the most appropriate construction of the statute," this Court need not "*find*" the Legislature's intent, but instead attempts " 'to *do*, responsibly, fittingly, intelligently, with and within the given frame.' " *Ante* at 538, n 16. In other words, the majority is attempting to rewrite the statute. I would prefer the majority adopt the statute's plain meaning (even if it creates an absurd result), rather than define this Court's role as one in which we endeavor to create good policy out of a poorly drafted statute.

[6] The employee in *Corbett v Plymouth Twp* has asked this Court to use the Michigan mortality statute, MCL 500.834; MSA 24.1834, of the Insurance Code. The majority does not explain how the life expectancy of an employee is to be calculated.

Shawn Corbett was twenty-nine years old when he elected to cash out his pension fund to which his employer had contributed $10,975.93. According to defendant Plymouth Township's calculations of the life-expectancy approach that the majority has adopted, Plymouth Township only would be able to coordinate $4.63 a week of its $283.02 weekly payment of worker's compensation to Corbett. Thus, it would take *forty-two years* for Plymouth Township to fully coordinate the after-tax value of its pension payments.[7] Similarly, Dennis Dane was only thirty-five years old when he received his lump-sum pension payment of $29,505. According to Dane's own calculations of the life-expectancy approach, his weekly payment of $328.54 would be reduced by only $14 a week. Dane would have to remain disabled and continue to receive worker's compensation benefits for almost *thirty-seven years* before Stroh Brewery would recover the full amount of the after-tax value of $29,505. *Id.* As evidenced by these cases, the majority's approach would fail to substantially eliminate duplicate payments, by allowing the injured employee to receive almost his entire weekly worker's compensation payment, and, therefore, might discourage some disabled employees from returning to work, thereby frustrating one of the purposes of the statute. See *Drouillard,* 449 Mich 300, n 1.

---

[7] As the parties noted at oral argument, Corbett was able to return to work after three and one-half years of disability. If Plymouth Township only was able to reduce its worker's compensation payments by $4.83 a week, it only would have recouped approximately $850 of the $8,386.03 (after-tax value of $10,975.93) it could coordinate under the statute.

In constructively distributing the lump-sum pension payments as periodic payments over the life expectancy of the employee, the majority's approach does allow for full coordination, but only on the basis of the erroneous assumption that a disabled worker will never return to work after his injury. The majority asserts that "[t]he statutory scheme includes an implicit assumption that the disability may continue over the employee's lifetime." *Ante* at 538. Yet, this assertion ignores the fact that the statute was designed to encourage some disabled workers to *return* to work, not to encourage them to remain idle while receiving double payments of wage-replacement benefits. See *Drouillard*, 449 Mich 300, n 1. The Court's adoption of the life-expectancy approach, assuming that an employee may not be able to return to work, might be self-fulfilling by discouraging workers who might otherwise return to work.

Once this Court refuses to apply the statute's plain language, it must attempt to further the legislative intent in the context of the statute's language and purposes. In examining the statute's language, § 354 has only provided a method for coordinating two different *periodic* payments, but is silent regarding the method for coordinating a lump sum with a periodic payment, despite the fact that the statute explicitly contemplates coordinating a lump-sum payment of worker's compensation with pension or retirement payments. See MCL 418.354(1); MSA 17.237(354)(1).[8] Nevertheless, a lump-sum pension payment, under the statute,

---

[8] "This section is applicable when either weekly *or lump sum payments* are made to an employee as a result of liability [under various worker's compensation provisions] with respect to the same time period

is still a wage-replacement benefit and is coordinated with weekly payments of worker's compensation. See *Drouillard*, 449 Mich 293. Under § 354, as Edward Welch explains, "[a]n employer's worker's compensation liability is reduced for virtually any other benefits the worker receives [e.g., pension] to the extent that the employer paid for the benefits." Welch, Worker's Compensation in Michigan: Law & Practice (3d ed), Coordination of Benefits, § 18.14, p 18-18. Thus, for pension or retirement benefits under subsection 354(1)(d), there is a "reduction in worker's compensation benefits for any payment made from a pension retirement plan . . . ." *Id.*, § 18.16, p 18-19. This is the point of the statute.

With this principle in mind, this Court would further the Legislature's intent by adopting the future-credit approach, by allowing the employer to coordinate its worker's compensation payments to its employee until the after-tax value of the employee's pension benefits has been exhausted, i.e., the employer may cease weekly worker's compensation payments until the pension payment has been fully coordinated. In this way, the statute fulfills the goal of eliminating double payments while still guaranteeing a wage-replacement benefit. Moreover, this approach may be applied to every case as a uniform rule and does not require this Court to rely on a mortality table not provided by the statute.

In these cases, the employers, Plymouth Township, Stroh Brewery, and McLouth Steel Products, paid their respective employees the cash value of the

---

for which . . . pension or retirement payments . . . are also received
. . . ." (Emphasis added.)

employee's pension benefits in a single lump sum: Corbett, $10,975.93; Dane, $29,505; and White, $13,039.94. At the same time, the employers were making a weekly payment for each employee's worker's compensation benefits: Corbett was receiving $283.02 a week; Dane, $328.54; and White, $409. In applying the future-credit method, one must first calculate the after-tax value of the lump-sum pension. payment and then divide that sum by the amount that the employer is paying weekly in worker's compensation benefits.[9] This computation will yield the number of weeks that the employer may coordinate the full amount of the weekly worker's compensation benefits. On this basis, I would reverse the WCAC's decision in *Corbett* to coordinate pension benefits over fifty-two weeks, and instead allow the employer to fully coordinate weekly payment of worker's compensation payments with the lump-sum pension payment. In *Dane*, I would reverse the WCAC's decision to calculate the coordination on the basis of an annuity and instead allow Stroh Brewery to coordinate the entire weekly payment. Lastly, in *White*, I would remand to the WCAC, directing it to enter an order consistent with the future-credit approach.

II

Moreover, I cannot agree with the majority's resolution of the rollover issue. The opinion dismisses the statute's language by labeling as "literalism" defendant McLouth Steel Products' argument that under the

---

[9] The Bureau of Worker's Disability Compensation provides a table that would enable a factfinder to calculate the after-tax value of a lump sum by referring to the table governing the after-tax amount of an annual income.

statute White has received his pension payment. *Ante* at 544. I think the better phrase would be *plain meaning*. Subsection 354(1)(d) provides that weekly worker's compensation benefits may be reduced by the "after-tax amount of the pension or retirement payments *received*" by the employee and does not condition the coordination of pension benefits on whether the employee actually begins to use these funds or invests them in a plan in which he will only later receive payments. The majority does not claim that the application of the ordinary meaning of the statute's terms would create an absurd result. Hence, it is bound to apply the statute's plain meaning. See *Salas, supra.*

The majority attempts to justify its interpretation in the final paragraph of part V by noting the statute's use of the "*after-tax* amount," but fails to note that subsection 354(13) defines "after-tax amount" as the amount remaining after subtracting the *estimated tax* the employee would pay on the benefit, not the actual tax the employee incurred:

> As used in this section, "after-tax amount" means the gross amount of any benefit under subsection . . . (1)(d) . . . reduced by the prorated weekly amount which *would have been paid,* if any, under the federal insurance contributions act, 26 USC 3101 to 3126, state income tax and federal income tax, calculated on an annual basis using as the number of exemptions the disabled employee's dependents plus the employee, and without excess itemized deductions. *In determining the "after-tax amount" the tables provided for in section 313(2) shall be used.* The gross amount of any benefit under subsection . . . (1)(d) . . . shall be presumed to be the same as the average weekly wage for purposes of the table. The applicable 80% of after-tax amount as provided in the table will be multiplied by 1.25 which will be conclusive for determining the "after-tax amount" of

benefits under subsection . . . (1)(d) . . . . [Emphasis added.]

The majority, in order to give effect to its interpretation, also engrafts onto the statute a requirement that, upon the request of an employer, the employee furnish the employer with information regarding any withdrawal from the IRA, even though there is nothing in the statute regarding such a requirement. See *ante* at 546.[10] Rather than straining to find a justification for its interpretation, the majority should instead accept that the Legislature intended its words to have their ordinary meaning where that meaning does not produce perverse results.

The majority's interpretation also creates other practical questions, unanswered by the statute, regarding the determination of when an employee receives the money his employer contributed to his pension. After withdrawing money from an IRA, an employee may claim that he has not yet received the employer's contribution to the pension because (1) he may claim he is first drawing on funds from the interest the pension has accrued, or (2) because he may have separately paid money into his IRA and claim that he is only drawing on that money. The majority also does not explain what would happen if the IRA lost money because it was invested in an unwise ven-

---

[10] This judicial creation also imposes a practical burden on the employer because the employee is only obliged to provide the information "upon request of the employer." An employee may withdraw money from an IRA at any time if he is willing to pay a tax penalty. Thus, in a situation like *Corbett*, where the employee was only twenty-nine years old when he received his lump sum, the employer may have to request information from the employee periodically for more than thirty years to ensure that the employee has not made an early withdrawal.

ture. Hence, because of this unwarranted interpretation, this Court may later have to address these questions and create solutions unguided by the statute. In other words, it will have to engage in further judicial legislation. Furthermore, the majority's interpretation ignores the fact that the employee may *immediately* enjoy the benefit of the employer's pension contribution that he places in the IRA investment by borrowing against the value of it as an asset.

Instead of embarking on this unauthorized excursion into unchartered waters, I would merely apply the plain meaning of the statute and affirm the Court of Appeals decision that McLouth Steel Products should coordinate the lump sum that White received and, subsequently, rolled over into an IRA.

III

With respect to the majority's conclusion that there was evidence to support the Worker's Compensation Appellate Commission's decision to affirm the hearing referee's grant of benefits to White, I also dissent. I do not believe that White's affective disorder was "contributed to or aggravated or accelerated by the employment in a *significant* manner" under MCL 418.301(2); MSA 17.237(301)(2), and I fear that the majority's application of the standard from *Gardner v Van Buren Public Schools*, 445 Mich 23; 517 NW2d 1 (1994), has virtually eliminated the importance of the word "significant" from the statute.

In *Gardner, supra* at 45, this Court required that under MCL 418.301(2); MSA 17.237(301)(2),[11] the

---

[11] "Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions, shall be compensable if contributed to or aggravated or accelerated by the employment in a sig-

employee demonstrate that his mental disability arose out of "actual events" and that there was a significant causal connection between those events and the employee's mental disability. As the majority notes, *ante* at 550, n 38, this Court in *Gardner, supra* at 47, articulated a totality-of-the-circumstances test for determining whether there was a significant factual causal connection:

> Under the statutory standard, causation is determined by the factfinder. It is not determined by the honest, even if unfounded, perceptions of the claimant. In determining whether specific events of employment contribute to, aggravate, or accelerate a mental disability in a significant manner, the factfinder must consider the totality of the occupational circumstances along with the totality of a claimant's mental health in general.
>
> The analysis must focus on whether actual events of employment affected the mental health of the claimant in a significant manner. This analysis will, by necessity, require a comparison of nonemployment and employment factors. Once actual employment events have been shown to have occurred, the significance of those events to the particular claimant must be judged against all the circumstances to determine whether the resulting mental disability is compensable.

In applying the totality-of-the-circumstances test, I do not believe that the ordinary stress that plaintiff encountered at work significantly contributed to, aggravated, or accelerated his mental disability.

Under MCL 418.861a(14); MSA 17.237(861a)(14),[12] when this Court reviews a decision by the WCAC, the

---

nificant manner. Mental disabilities shall be compensable when arising out of actual events of employment, not unfounded perceptions thereof."

[12] MCL 418.861a(14); MSA 17.237(861a)(14) provides in full:

WCAC's findings of fact are conclusive in the absence of fraud "if there is any competent evidence to support them." *Holden v Ford Motor Co*, 439 Mich 257, 263; 484 NW2d 227 (1992). In its opinion dated November 18, 1994, the WCAC found that plaintiff White suffered from anxiety when he was forced to accept the position of masonry foreman or be laid off, and that the stress of this new position caused him nervousness, sleeplessness, and diarrhea. 1994 Mich ACO 2680. The WCAC noted that "nothing unusual happened at work [on August 4, 1988,]" but that White was unable to continue working because of the stress. *Id.* at 2681. White later returned to work, but, on January 16, 1989, the stress left him unable to work, despite the fact that "there were no unusual occurrences at work" on that day either. *Id.* The WCAC noted that plaintiff had a preexisting condition, an "organic brain syndrome," that apparently rendered him susceptible to mental disability from this kind of stress. *Id.*

The majority relies on the analysis from *Gardner* in which this Court stated that even "ordinary" events may be injurious to a predisposed employee and that an employer must take an employee as it finds him, with his preexisting mental frailties. *Ante* at 550-551. However, this analysis was focused on the prong of the *Gardner* test in which the employee must prove that the injury must arise out of "actual events of

The findings of fact made by the commission acting within its powers, in the absence of fraud, shall be conclusive. The court of appeals and the supreme court shall have the power to review questions of law involved with any final order of the commission, if application is made by the aggrieved party within 30 days after the order by any method permissible under the Michigan court rules.

employment, not unfounded perceptions thereof," and not the separate prong that the employee must establish that the actual events were significant in contributing to, aggravating, or accelerating the mental disability.[13] Admittedly, the Court appeared to expect this analysis to apply to either prong.

Nevertheless, this Court cannot expressly apply this analysis to the significant-manner requirement without effectively nullifying the importance of it as a separate prong and defeating the effort of the Legislature to introduce an objective element to the test when it rejected this Court's interpretation of the worker's compensation act in *Deziel v Difco Laboratories, Inc (After Remand)*, 403 Mich 1; 268 NW2d 1 (1978). See *Gardner, supra* at 39-42 ("The Legislative Reaction to *Deziel*"). The standard in *Gardner, supra* at 27-28, requires that an employee establish (1) a mental disability, (2) arising out of actual events of employment, and (3) contributing to, aggravating, or accelerating the mental disability in a significant manner. Whenever an employee establishes a mental disability that arose out of actual employment events, he will easily be able to meet the third prong of proving that the events contributed to, aggravated, or accelerated the disability in a significant manner where ordinary events are the cause of the injury for the predisposed person. According to the combined analysis of the majority here and in *Gardner*, the employment event

---

[13] The Court in *Gardner, supra* at 27, framed the basic issue it was addressing as follows:

[W]e must decide whether the statute requires an objective or subjective analysis when examining the significance of "actual events of employment" in determining the compensability of mental disabilities.

need only be *the precipitating event* for the mental disability. The precipitating event is almost always subjectively significant to the mental disability if it caused the employee's injury to manifest. Thus, under my understanding of the majority's standard, the third prong has been effectively nullified.

Moreover, the test contains no important objective element. The only objective element prevents recovery for injuries that arise from hallucinations or delusions that occur during work when there has been no work-related event. In all other respects, the test is now virtually indistinguishable in practice from the subjective standard the Legislature wished to "substantive[ly]" change. *Gardner, supra* at 42. Compare the current test as understood by this Court with the rejected *Deziel* test (as digested by this Court in *Peters v Michigan Bell Telephone Co*, 423 Mich 594, 599; 377 NW2d 774 [1985]). The employee must establish the following:

> (1) the claimant was disabled;
>
> (2) an injury in the form of a precipitating work-related event had occurred;
>
> (3) using a subjective causal nexus standard, the employment had combined with some internal weakness or disease to produce the disability. [Citing *Deziel, supra* at 37.]

I fail to see the important substantive difference between this test and the current test.

Instead of inviting a second legislative effort to correct our work, I would interpret the word "significant" in the statute as requiring that the actual events at work be objectively traumatic, even if they would not be injurious to an ordinary person, requiring the employee to allege specific events rather than general

assertions of anxiety. I cannot say that a person's employment contributed to, aggravated, or accelerated a mental disability in a *significant* way if the work-related event was only innocuous and benign, or, in other words, was an ordinary work event. This Court should interpret the statute to ensure that the injury was substantially contributed to, aggravated, or accelerated by actual work-related events and that the employment environment was not merely the occasion for which the mental disability could become manifest. See *Gardner, supra* at 65-66 (RILEY, J., dissenting).[14] In applying this test to White's case, I would reverse and order the WCAC either to allow him an opportunity to allege specific work-related events that affected his mental disability in a significant way or enter an order denying him benefits under this claim. He has yet to bring specific allegations of any traumatic work-related events. I note, however, that particularly stressful circumstances of a specific incident at work could be objectively traumatic and sig-

---

[14] I believe that a claimant for a work-related mental disability must establish by a preponderance of the evidence, as a matter of objective reality, an actual and traumatic event. Otherwise, the danger that the alleged harm is a mere manifestation of an underlying problem and not a cause is too great. A successful claim should require proof of specific incidents and not merely general conclusions of stress, anxiety, or exertion over a period of time.

I recognize that I offered these arguments in the context of analyzing the actual-events prong in *Gardner*. However, in light of the *Gardner* Court's interpretation of this prong, I believe it appropriate to interpret the significant-manner-requirement prong as containing a significant objective element.

nificantly contribute to, aggravate, or accelerate an employee's mental disability. I would reverse and remand this case for further proceedings.

BRICKLEY, C.J., and WEAVER, J., concurred with RILEY, J.